JOHN DOE *vs.* JANE DOE & another.[1]

Suffolk.    March 13, 1974. — July 3, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Equity Jurisdiction,* Suit between husband and wife, Personal right. *Husband and Wife. Parent and Child. Constitutional Law,* Abortion. *Abortion.*

General Laws c. 209, § 6, does not deprive this Court of jurisdiction over a suit in equity by a husband against a wife concerning personal rights. [559]

This Court has jurisdiction with respect to declaratory relief in a suit by a husband to prevent his wife's having an abortion of a non-viable fetus, although difficulty of enforcement may preclude injunctive relief. [559]

Neither the Federal Constitution, nor any state statute, nor the common law gives a husband the right to prevent his estranged wife from having the abortion of a non-viable fetus. [559-564] HENNESSEY, J., dissenting in part [564-567]; REARDON, J., dissenting [567-574].

---

[1] William E. Callahan, M. D. The names John Doe and Jane Doe are pseudonyms.

Discussion by REARDON, J., dissenting, of authorities on the right of a
husband to prevent his wife from having an abortion. [569-573]

BILL IN EQUITY filed in the Supreme Judicial Court for the
county of Suffolk on March 5, 1974.

The suit was reserved and reported by *Reardon,* J.

*Mark I. Berson* (*Burton Winer & Herbert H. Hodos* with
him) for the plaintiff.

*Paula W. Gold* (*Peter M. Wendt* of New Jersey, *& Judith
Rubenstein* of California, with her) for the defendant.

*Neil L. Chayet,* guardian ad litem, pro se.

*Charles P. Kindregan,* guardian ad litem, pro se.

*William A. Lynch,* amicus curiae, pro se, submitted a
brief.

*Katherine Allen & Eileen Shaevel,* for Center for Wom-
en's Legal Studies, amicus curiae *& John H. Henn,* for Civil
Liberties Union of Massachusetts, amicus curiae, joined in
a brief.

*James C. Heigham* for Crittenton Hastings House of the
Florence Crittenton League, amicus curiae, submitted a
brief.

BRAUCHER, J.    An estranged husband sought declarato-
ry and injunctive relief against his pregnant wife, who
intended to procure an abortion over his objection. After
argument a majority of the court on March 14, 1974,
ordered entry of a decree declaring that an abortion might
be performed on her, without the consent of her husband,
by the defendant physician or any other duly licensed
physician. We now state our reasons.

The husband's bill was filed in the county court on
March 5, 1974. On March 8 a single justice of this court
ordered the appointment of a guardian ad litem for the
unborn child and, after hearing, granted the husband's
prayers for temporary relief, restraining the wife and the
physician from proceeding with the planned abortion. On
March 12 the single justice filed findings of fact, the wife
filed a demurrer, an answer, an exception to the appoint-
ment of a guardian ad litem, and a motion to supplement
the findings of fact, and the single justice reserved and
reported the case to the full court. Briefs were submitted by

the husband, the wife, and various friends of the court, and the guardian ad litem filed a report. We heard argument on March 13, and the following day we issued an order vacating the decree of the single justice, directing entry of a decree granting the wife's prayers for declaratory relief, and stating, "A rescript and opinions of the full court will follow." Presumably the abortion was promptly performed.

We summarize the evidence, which was largely undisputed. The husband, then twenty-seven years of age, married the wife, then twenty-three years of age, on April 17, 1973, and they lived together in this Commonwealth as husband and wife. The husband is employed as a truck driver, earning $200 a week. Before the marriage, in 1972, the wife had a child by another man. She first became pregnant by her husband in June, 1973, and suffered a miscarriage in August, 1973. About November 12 she again became pregnant by her husband. This pregnancy was a wanted pregnancy on the part of both husband and wife.

The husband and wife separated late in January, 1974. Early in February, the husband told the wife that he did not want to support the child, and that to avoid responsibility for the child he did not want his name on the birth certificate as the father. Thereafter the wife, notwithstanding her previously expressed sentiments against abortion, told her husband that she wished to terminate the pregnancy, saying she did not think she could handle two children and did not want the second child. The husband objected and brought this suit. He testified that he was willing to support the child and to assume custody and that he had considered arrangements for its care, including day care by the wife's sister. The wife testified that she did not think either her husband or her sister was capable of taking care of a child and that if prevented from having an abortion she would never consent to having custody given to her husband.

Medical testimony indicated that the wife's general health was good. Her first pregnancy was normal and resulted in the birth of a normal child. At the time of our order she was about eighteen weeks along in her pregnancy.

The fetus was not viable. There was little risk of serious injury to her health in a saline abortion performed before twenty-eight weeks of gestation have elapsed. There was likewise little risk of serious injury in carrying the pregnancy to normal delivery.

1. *Jurisdiction.* The wife argues that this court lacks jurisdiction over this case, citing G. L. c. 209, § 6 (suits between husband and wife). Apart from that statute, however, suits in equity may be maintained between husband and wife "where there exists some recognized ground of general equity jurisdiction or some controversy over property rights, as distinguished from a mere debt or contractual obligation." *Charney* v. *Charney*, 316 Mass. 580, 582-583 (1944). Compare *Purple* v. *Purple*, 354 Mass. 770 (1968). We have rejected "the formula that equity protects only property rights" and recognized "the true rule to be that equity will protect personal rights by injunction upon the same conditions upon which it will protect property rights by injunction." *Kenyon* v. *Chicopee*, 320 Mass. 528, 532-534 (1946).

Although we think there is no lack of jurisdiction in this case, there is a serious question whether its subject matter is within the general principles of equity jurisprudence. Compare *Mark* v. *Kahn*, 333 Mass. 517, 519-520 (1956), with *White* v. *Thomson*, 324 Mass. 140, 142-143 (1949). There are "personal rights of such delicate and intimate character that direct enforcement of them by any process of the court should never be attempted." *Kenyon* v. *Chicopee*, *supra*, at 534. This objection has more force with respect to injunctive relief than with respect to declaratory relief. The practical impact of existing legal uncertainties on doctors and hospitals is such that clarification is in the public interest, and the same considerations which bear on the propriety of equitable relief also bear on the substantive rights of the parties. Assuming that at least declaratory relief is proper, therefore, we turn to the substantive questions presented.

2. *Constitutional rights of the husband.* The husband contends that he has a fundamental right, guaranteed by

the Constitution of the United States, to determine that his child shall not be aborted, citing the concurring opinion of Mr. Justice Goldberg in *Griswold* v. *Connecticut*, 381 U. S. 479, 493 (1965). It is true that in various contexts the Supreme Court has declared that certain interests associated with the marital relationship give rise to rights guaranteed by the Federal Constitution. See, e.g., *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535 (1925); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942); *Griswold* v. *Connecticut*, 381 U. S. 479, 496 (1965); *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967). These and other cases formed the basis for the court's recognition of a right of privacy in *Roe* v. *Wade*, 410 U. S. 113, 152-154 (1973). But all those cases involved a shield for the private citizen against government action, not a sword of government assistance to enable him to overturn the private decisions of his fellow citizens. See *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 172 (1972); *Eisenstadt* v. *Baird*, 405 U. S. 438, 453 (1972). We find no basis for the husband's assertion that the Constitution enables him to summon the Commonwealth to help him in a dispute with his wife.

3. *Statutory rights.* The husband does not claim support for his position from any statute of the Commonwealth. Nor could he. Our statute on abortion, like the traditional statutes of most States, is a criminal statute, forbidding an abortion unless performed "in good faith and in an honest belief that it is necessary for the preservation of the life *or health* of the woman" (emphasis supplied). *Kudish* v. *Board of Registration in Medicine*, 356 Mass. 98, 99-100 (1969),[2] interpreting G. L. c. 272, § 19. The statute was rendered inoperative for the purposes of the present case by the decision in *Roe* v. *Wade*, 410 U. S. 113, 166 (1973). *Women of the Commonwealth* v. *Quinn*, Civil Action No. 71-2420-W (D. Mass. Feb. 21, 1973).

---

[2] *Roe* v. *Wade*, 410 U. S. 113, 118, n. 2 (1973), is incomplete in saying that our statute was "construed to exclude an abortion to save the mother's life."

In other States, recent statutes have dealt in various ways with the issue now before us. The Am. Law Inst., Model Penal Code, § 230.3 (Proposed Official Draft, 1962), the Uniform Abortion Act (1971), and the statutes of many States make no mention of the husband's consent. See *Roe* v. *Wade*, 410 U. S. 113, 140, 146, n. 40 (1973); *Doe* v. *Bolton*, 410 U. S. 179, 182, 205-207 (1973). Statutes in some States provide for the consent of the husband.[3] In several of those States the husband's consent is given effect only where the wife is a minor or incompetent.[4] In several his consent is required only if the parties are living together or is dispensed with in cases of separation or abandonment.[5]

In neither *Roe* v. *Wade* nor *Doe* v. *Bolton* did the Supreme Court "discuss the father's rights, if any exist in the constitutional context, in the abortion decision." No paternal rights had been asserted in either of the cases, and the governing "statutes on their face take no cognizance of the father." The court found it unnecessary to "decide whether provisions" recognizing the father in certain circumstances "are constitutional." 410 U. S. at 165, n. 67. In lower courts statutes requiring the husband's consent have not withstood constitutional attack. *Coe* v. *Gerstein*, Civil Action No. 72-1842 (S. D. Fla. Aug. 14, 1973), app. dism. and cert. den. 417 U. S. 279 (1974). *Doe* v. *Rampton,* 366

---

[3] Ark. Anno. Sts. § 41-305 (1964) (see Supp. 1973). Colo. Rev. Sts. § 40-6-101 (3) (1963) (see Supp. 1971). Fla. Anno. Sts. § 458.22 (3) (1965) (see Supp. 1974-1975). Idaho Code § 18-609 (1947) (see Supp. 1973) (as to civil liability without negligence). La. Rev. Sts. Anno. § 40:1299.33D (1965) (see Supp. 1974). Mont. Rev. Codes § 94-5-616 (1947) (see Interim Supp. 1974) (written notice to husband). Neb. Rev. Sts. § 28-4,152 (1964) (see Supp. 1973) (consent of "father"). Nev. Rev. Sts. § 442.250 (3) (1973). Ore. Rev. Sts. § 435.435 (c) (1973). S. C. Code § 16-87 (3) (1962) (see Supp. 1973). S. D. Laws Anno. § 34-23A-7 (1967) (see Supp. 1973). Utah Code Anno. § 76-7-304 (1953) (see Supp. 1973). Va. Code Anno. § 18.1-62.1 (e) (1960) (see Supp. 1973) (consent if defect likely). Wash. Rev. Code Anno. § 9.02.070 (see Supp. 1972). The North Carolina statute cited in *Roe* v. *Wade*, 410 U. S. at 165, n. 67 (1973) was amended to eliminate the husband's consent by N. C. Laws 1973, c. 711. N. C. Gen. Sts. § 14-45.1 (1969) (see Supp. 1973).

[4] Arkansas, Louisiana, and South Dakota. In South Carolina and Virginia, there are consent provisions for minor wives in addition to provisions for certain other cases. See n. 3, *supra.*

[5] Florida, Idaho, Montana (notice dispensed with), Nevada, Oregon, South Carolina, Virginia, and Washington.

F. Supp. 189, 192 (D. Utah 1973). See note, 42 U. of Cinn. L. Rev. 441, 459-462 (1973); Tribe, Foreword, 87 Harv. L. Rev. 1, 38-41 (1973); comment, 35 Mont. L. Rev. 103, 106, n. 33 (1974).

4. *Common law rights.* Before the 1973 decisions of the Supreme Court in *Roe* v. *Wade* and *Doe* v. *Bolton,* there was little occasion for the development of legal doctrines with respect to the civil rights and remedies of the parties to the abortion decision, since criminal statutes occupied the field pretty thoroughly. Such authority as there was tended to deny the husband an enforceable right. *Herko* v. *Uviller,* 203 Misc. (N. Y.) 108, 109 (1952). See Means, The Law of New York Concerning Abortion and the Status of the Foetus, 1664-1968, 14 N. Y. L. F. 409, 428-434 (1968); note, 14 Stanford L. Rev. 901, 903 (1962). Compare *Leccese* v. *McDonough,* 361 Mass. 64, 67 (1972).

After the 1973 decisions, recognition of an enforceable right in the husband to prevent the abortion would raise serious constitutional questions. Although the court did not pass on the husband's right, it used language inconsistent with such a right. It recognized "a right of personal privacy, or a guarantee of certain areas or zones of privacy . . . broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U. S. at 152-153. During the first trimester "the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated." *Id.* at 163. Thereafter, until the fetus is viable, "the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health." *Id.* at 164.

The cases since *Roe* v. *Wade* give little support to the husband's claim. In a case involving an unmarried woman during the first trimester of pregnancy, a Florida court ruled that the putative father's claim was not covered by the Florida statute and denied relief apart from statute. *Jones* v. *Smith,* 278 So. 2d 339, 344 (Fla. App. 1973), cert. den. 415 U. S. 958 (1974). Compare *Doe* v. *Bellin Memorial*

*Hosp.* 479 F. 2d 756, 758-759 (7th Cir. 1973). A lower court in Illinois has apparently denied relief to a husband in a similar case. *Pound* v. *Pound,* (January 31, 1974) 42 U. S. L. Week 2456 (Ill. Cir. Ct.). If the State cannot interfere with the abortion decision, before the fetus is viable, except in ways reasonably related to maternal health, it seems highly doubtful that it can come to the husband's assistance with authority it does not itself possess. See *Coe* v. *Gerstein, supra;* note, 42 U. of Cinn. L. Rev. 441, 466 (1973). Compare *Corning Glass Works* v. *Ann & Hope, Inc. of Danvers,* 363 Mass. 409, 422-424 (1973).

If it is within our power, free of constitutional prohibition, to fashion a rule of decision recognizing an enforceable right in the husband, we decline to do so, at least where the fetus is not viable. The law of adoption might provide useful analogies, but it also discloses the complexity of the policy questions which can arise. See G. L. c. 210, as amended. In the days when most abortions were criminal, the patient was not punished. See *Commonwealth* v. *Follansbee*, 155 Mass. 274, 277 (1892), and cases cited. Injunctions and other threats against licensed physicians may drive determined women into the waiting offices of persons not licensed. Compare *Commonwealth* v. *Schaflander*, 361 Mass. 856 (1972); *Commonwealth* v. *Kudish*, 362 Mass. 627, 629 (1972). Except in cases involving divorce or separation, our law has not in general undertaken to resolve the many delicate questions inherent in the marriage relationship. We would not order either a husband or a wife to do what is necessary to conceive a child or to prevent conception, any more than we would order either party to do what is necessary to make the other happy. We think the same considerations prevent us from forbidding the wife to do what is necessary to bring about or to prevent birth, at least before the fetus is viable and in the absence of any danger to maternal life or health. Some things must be left to private agreement.

Nothing we say here is intended to affirm or deny a right in the husband to divorce, separation, child custody, or the like by reason of an abortion procured by his wife without

his consent. We are deeply conscious of the husband's interest in the abortion decision, at least while the parties are living together in harmony. Surely that interest is legitimate. Surely, if the family life is to prosper, he should participate with his wife in the decision. But it does not follow that he must have an absolute veto, or that his veto, reasoned or unreasoned, can be enforced by the Commonwealth.

HENNESSEY, J. (dissenting in part). I concur in part with, and dissent in part from, the majority opinion. I concur with the court's decision not to enjoin the wife from procuring the abortion. To issue such an injunction would have placed this court in an untenable position if it became necessary to enforce the order or punish for its violation.

At the same time, I dissent from the court's determination that the husband has no legal rights. I would have, while denying injunctive relief, simultaneously declared that the husband has fundamental rights here and that in the circumstances of this case the wife has a duty to forbear the abortion. Justice required such a declaration even though injunctive relief was denied.

The recent cases of *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Doe* v. *Bolton*, 410 U. S. 179 (1973), are central to the issues raised here. It is the ruling of the Supreme Court of the United States that no laws may prohibit the taking of human fetal life in the approximate first six months of its existence. Abortions may be regulated by law during the approximate fourth to sixth months but only to the extent of requiring safe conditions for the woman. Laws may proscribe abortions during the approximate final three months of fetal life before birth. Even during those final three months the laws cannot prohibit abortion when it is necessary to preserve the life or health of the woman.

I agree with the dissenting Justices of the Supreme Court of the United States in the cases of *Roe* v. *Wade* and *Doe* v. *Bolton* that the court in those cases has indulged in an unwarranted interference with the rights of the people to regulate abortions through legislation. Thus, Mr. Justice

White, dissenting in the case of *Doe* v. *Bolton*, 410 U. S. at 222 (1973), wrote: "As an exercise of raw judicial power, the Court perhaps has authority to do what it does today; but in my view its judgment is an improvident and extravagant exercise of the power of judicial review that the Constitution extends to this Court. . . . In a sensitive area such as this, involving as it does issues over which reasonable men may easily and heatedly differ, I cannot accept the Court's exercise of its clear power of choice by interposing a constitutional barrier to state efforts to protect human life and by investing mothers and doctors with the constitutionally protected right to exterminate it. This issue, for the most part, should be left with the people and to the political processes the people have devised to govern their affairs."

It follows that I cannot join the majority of my colleagues of the Supreme Judicial Court in a voluntary extension of the rules of the cases of *Roe* v. *Wade* and *Doe* v. *Bolton*. For it is clear that the *Wade* and *Bolton* cases are not directly controlling here. Indeed the *Wade* case expressly reserves, at 165, n. 67, the question now before us of the father's rights. Further, in the *Bolton* case, at 189, the court said that a woman's constitutional right to an abortion is not absolute.

Nor, in my view, are the father's claims disposed of by any acceptable extension of the basic premises of the *Wade* and *Bolton* cases. The Supreme Court has stated in essence that the woman has a fundamental right of private decision to terminate the pregnancy. No right of the fetus is recognized by that court, at least during the first two trimesters.

But the father has rights. They are familial. They antedate the Constitution; they are about as old as civilization itself. They center in a main potentiality of his marriage: the birth and raising of children. Few human experiences have meaning comparable to parenthood. The father's rights asserted here are surely among the fundamental rights protected by the Constitution.

In the circumstances of the case before us, the father's

rights were dominant. The woman's health was not a factor. She had separated from her husband and did not want the child because she doubted her ability to care for the child and because she said her husband had indicated to her that he would not support it. The husband wanted the pregnancy to continue to full term and a normal birth. He stated that he would be willing to assume custody, and care for the child, in the event that the wife would not. The wife's assertions were not supportable by contrast with those of her husband. Thus, justice to her husband, at the very least, required forbearance by the wife.

Having said that, I turn to the unique problem raised by the husband's prayer for injunctive relief. A majority of this court by the order of March 14, 1974, declined to restrain the abortion. This conclusion by the court is not necessarily inconsistent with the declaration of rights I have urged above. Although the nature of the injunction sought here may be within the general equity jurisdiction of this court (see *Kenyon* v. *Chicopee*, 320 Mass. 528 [1946]), it is also true that such relief lies in the sound discretion of the court. What the court is asked to do here is to restrain conduct of an extraordinarily personal and delicate nature. What is involved here are "personal rights of such delicate and intimate character that direct enforcement of them by any process of the court should never be attempted." *Id.* at 534. The husband's claim is unprecedented in our jurisprudence because, until the recent Supreme Court rulings, the wife's contemplated conduct was forbidden by the criminal law.

It is axiomatic that a court should not enter an injunction unless it is able and willing to enforce it and punish for contempt of it. In any case where personal conduct is restrained, incarceration of the respondent may be the only effective way to prevent a violation of an injunction, or perhaps to punish for a violation. Thus the unseemly, almost unthinkable, prospect arises of the incarceration of the wife to prevent, or punish for, an abortion. This result would be visited upon a woman who was in no way in violation of the criminal law.

Nevertheless, it was of the utmost importance for us to

state that the wife has a duty in these circumstances to refrain from any intentional interference, by herself or by coöperation with others, with the progress of her pregnancy to a full term and birth. This should have been done in justice to the husband, for the moral force of the pronouncement, and as some clarification of future legal aspects of the marriage. Further, the failure to declare these rights carries the clear, and I believe as yet unwarranted, implication that the Massachusetts Legislature has no constitutional authority to enact legislation requiring the husband's consent before an abortion may be performed.

REARDON, J. (dissenting). This is a case where a court order has taken from a potential father the right to have his child born, a child which he and his wife both wanted at the time of conception. Although the majority opinion appears to be "deeply conscious of the husband's interest in the abortion decision," and to recognize that interest as legitimate, the effect of that opinion is to destroy completely that interest in any meaningful sense. Since this is the result of the majority opinion I am constrained to dissent.

The resolution of the issues presented by the bill before the court requires entry by the court into areas of such delicacy and perplexity that the usually adequate tools of judicial scrutiny appear crude and clumsy, ill-suited to the task at hand. If nevertheless it is clear that real and substantial interests of the parties are at stake, it is incumbent upon the court to make as fair and honest a determination as is within its ability. To declare that the court may withdraw from that duty as matter of jurisdiction or policy is not only incorrect, it is self-deluding. Under the decision of the majority, a substantial, indeed precious, interest of the husband has been extinguished. While it is true that the court in *Kenyon* v. *Chicopee*, 320 Mass. 528, 534 (1946), eschewed equitable enforcement of "personal rights of . . . [a] delicate and intimate character," the principal concern there appeared to be with the "difficulty . . . expected in administering relief by injunction." In the present case there was no indication that the wife would

resist an order of the court nor was the relief requested of an open-ended and continuing nature. Moreover, the hesitancy of courts of equity to become involved in complex and continuing problems of enforcement must surely be balanced against the seriousness of the consequences of refusing to act. We have here a situation in which the loss suffered by the husband is dramatically and utterly irreversible and where the severity of the deprivation can be gauged only by the most sensitive and profound human faculties. It seems to me that the real lesson of the *Kenyon* case is not in the gratuitous dicta to which reference has been made but in the reaffirmance of the principle that equity will respond to imminent threats to important interests of parties and will not be bound by rigid and often unreasoning formulae limiting its jurisdiction. *Id.* at 533-534. I am persuaded that a legitimate and judicially cognizable interest of the husband was at stake in this case and that it was appropriate to grant relief to preserve it.

It is at first necessary to deal with the contention that the case is controlled by the implications of the decisions of the United States Supreme Court in *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Doe* v. *Bolton*, 410 U. S. 179 (1973).[1] Such a reading is a misconception of the real questions involved in the *Wade* and *Bolton* cases and the cases upon which they are based. As the majority recognize, these cases held certain decisions of individuals to be within "zones of privacy," but those are areas into which the *State* may not enter. "This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and *restrictions upon state action*, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy" (emphasis supplied). 410 U. S. 153. An examination of other "right of privacy" decisions reveals the same underlying rationale. *Meyer* v. *Nebraska,* 262

---

[1] It is obvious by its express language that the court declines to deal with this question. *Roe* v. *Wade*, 410 U. S. 113, 165, n. 67 (1973).

Doe *v.* Doe.

U. S. 390, 402 (1923). *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925). *Prince* v. *Massachusetts,* 321 U. S. 158, 165 (1944) (rights of parents in religious training of children). *Griswold* v. *Connecticut,* 381 U. S. 479, 483-484 (right of marital privacy). *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967) (right to marry). *Eisenstadt* v. *Baird,* 405 U. S. 438, 457 (1972) (right to decide to beget or not to beget children). *Wisconsin* v. *Yoder,* 406 U. S. 205, 223 (1972) (rights of parents in education and upbringing of children). In each case the right of privacy was but the correlative of the duty of the State to refrain from activity to which, by virtue of the limited nature of our constitutional government, it was obliged to remain a stranger. But who will assert that the husband here is, or could ever be, a stranger to the destruction of the fetus which he begot or to the possible future birth of his child? At base it was respect for the intimacy of certain sectors of human life which compelled the decisions of the Supreme Court insisting that government refrain from interfering in these private determinations. It is that same respect which informs us that a potential father's rights in the birth of a child cannot be dissolved by unreasoned reference to the Fourteenth Amendment.[2]

I believe that the interests of fathers in the birth of offspring en ventre sa mère may be discerned in the constitutional and common law of the Commonwealth. To find its roots we need look no further than the Preamble to our Constitution which declares among the purposes of the Commonwealth the provision to its citizens of "the power of enjoying in safety and tranquility their natural rights." Article 1 of our Declaration of Rights proclaims the exist-

---

[2] Thus the question is not as the majority put it, whether the State "can come to the husband's assistance with authority it does not itself possess." It is no State interest but a private interest of the most compelling nature which we are asked to recognize and enforce. The special limitations on State intrusion into such protected private decisions have no relevance to this issue. There is nothing unusual in a court's enforcing private rights which might be denied to the government. See *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163 (1972). Otherwise, the cases cited in the majority opinion forbidding State regulation of certain familial relations would have removed a large part of the statutory and common law of domestic relations from the jurisdiction of the courts.

ence of "natural, essential, and unalienable" rights. The broad and elusive character of such "natural rights" makes their invocation a serious and even dangerous business, one never to be lightly undertaken. But when a citizen comes before this court asking for the protection of an interest which is plainly grounded in the most universal of human emotions, and which has in related forms been recognized and nurtured for centuries by the common law, he raises a cogent claim to judicial recognition of his natural right.

The legal and philosophical sources to which the draftsmen of both our Massachusetts Constitution of 1780, and the Federal Constitution which followed seven years later repaired, are well known. Thinking as they did, it is not conceivable to me that transported into this century they would read their own language to compel the action which finds me in dissent and which seems so contrary to what underlay their work. The immovable place of natural rights in the common law was well understood by those draftsmen. It was thoroughly comprehended at the very beginning of the history of English law as well. Bracton saw natural law as "a certain instinctive impulse arising out of animate nature by which individual living things are led to act in certain ways." 2 Bracton, On the Laws and Customs of England (Thorne rev.) Introduction 26 (1968). If any interest of mankind can be said to lay claim to a place in natural law the interest of a parent in his child must be so recognized. Blackstone called it "the most universal relation in nature." Noting that the obligation of parents to children had its foundation in the law of nature, he found their duties self-evident, a result of Providence "implanting in the breast of every parent that natural στοργη, or insuperable degree of affection, which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress or extinguish." 1 Blackstone, Commentaries, 446-447 (1807). It is possible of course to belittle the effect of these natural relations but they influence our judicial actions today as surely as they have done for the last 700 years. Thus the

Supreme Court found that "strict scrutiny" under the equal protection clause was needed when a classification touched the right of procreation, a "basic civil . . . [right] of man." *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942). It was the same tacit acceptance of the fundamentality of private family rights which underlay the court's rejection of a statutory scheme which failed to provide procedural protection to a natural father deprived of the custody of his children. "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' *Kovacs* v. *Cooper*, 336 U. S. 77, 95 (1949) (Frankfurter, J., concurring)." *Stanley* v. *Illinois*, 405 U. S. 645, 651 (1972). The "right of privacy" cases discussed above have as an implicit assumption that as matter of practical universal agreement and natural right there exists a critical interest in individual control of certain aspects of human lives. The explicitly defined prohibition of State interference with these rights evinces an implicit recognition that to some degree these interests are protectible against private persons as well. Thus there is a cognizable private interest in begetting and raising children and, indeed, in the termination of a pregnancy. It is, I submit, equally true that such an interest exists in the father with respect to the completion in birth of an existing pregnancy.

The existence of this interest is further evidenced by long lived and undisputed rights which the common law has recognized. The presumptive common law rule, in the absence of statute or court decree, is that custody of children is in the father. *Commonwealth* v. *Briggs*, 16 Pick. 203 (1834). *Barry* v. *Sparks*, 306 Mass. 80, 82-83 (1940). *Kauch, petitioners*, 358 Mass. 327 (1970). While more

enlightened times have raised the position of the mother to equality in matters of custody, this has not been at the expense of the father-child relationship. The rights of the father may not be extinguished when the mother and a second husband seek adoption without the father's consent. *Broman* v. *Byrne*, 322 Mass. 578 (1948). *Hathaway* v. *Rickard*, 323 Mass. 501 (1948). The law thus clearly recognizes what nature has made inevitable: the universal bond of affection and devotion between father and child.

Furthermore, it would be absurd to posit that this interest springs into existence full grown on the day of birth. As in the case of the mother, the period of gestation is for the father one of anxiety, anticipation, and growth in feeling for the unborn child. See, generally, Spock, Baby and Child Care, 28-31 (Rev. Pocket Book ed. 1968). The modern trend is for fathers to take a more active role in the pregnancy and, indeed, to participate during the mother's labor and delivery of the child. Wright, The New Childbirth, 158-190 (Pocket Book ed. 1971). The law has not been insensitive to the undeniable interest of parents in their children even prior to their birth. Thus over a period of years the law has recognized remedies for injuries to unborn children in tort and under the wrongful death statute. Compare *Dietrich* v. *Northampton*, 138 Mass. 14 (1884), with *Keyes* v. *Construction Serv. Inc.* 340 Mass. 633 (1960), and with *Torigian* v. *Watertown News Co. Inc.* 352 Mass. 446 (1967). Perhaps the most obvious legal recognition of the fact that the parental interest in children precedes birth is in the area of the distribution of estates. Thus a class gift to children by a testator is ordinarily construed to include posthumously born children since this is quite rightly deemed to be within the scope of the intended gift. See *In re Salaman*, [1908] 1 Ch. 4, 98 (1907); comment, 33 Mich. L. Rev. 414 (1935). This has long been the law of Massachusetts. *Hall* v. *Hancock*, 15 Pick. 255 (1834) (Shaw, C.J.). Moreover, under the theory of the pretermitted child statute, the law again quite properly deems a testator not to have omitted a bequest to any child including one yet unborn unless an intention to do so is clearly indicated.

G. L. c. 191, § 20. *Bowen* v. *Hoxie*, 137 Mass. 527 (1884).[3] In these areas and others the idea that a parent's interest in children preceded the birth is not a novelty to our law. Thus, not only as a matter of common sense and feeling but also as a natural extension of familiar legal principles, it would be only expected that, were no other rights involved, a court of equity would protect a father's interest by prohibiting the destruction of a fetus in utero.

The great difficulty, of course, is that there are other rights involved, very substantial rights. If it were unclear before, it is surely clear since the decisions in *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Doe* v. *Bolton*, 410 U. S. 179 (1973), that there is at least limited right in a woman to decide whether to terminate a pregnancy. The contours of that right with respect to regulation by the State were defined in those opinions. Although, as I have noted, those rulings did not declare the extent of any such rights with respect to infringement by other private persons, it is a natural inference that such a right does exist to some degree. Neither the interest of the father in bringing the pregnancy to term nor that of the mother in terminating the pregnancy has been declared to be absolute and to cancel the other.[4] The balance of these two rights, each of such a sensitive and personal nature, is, as I see it, the real task confronting the court. The factors which might bear on this decision and the weight to which they should be accorded are matters which would be peculiarly suited for legislative

[3] The *Bowen* case dealt with a predecessor statute which specifically referred to omitted afterborn children. Afterborn children are now included in the general statute.

[4] Even with respect to State interference, the *Wade* case made clear that a woman's right to abortion is limited in some ways. 410 U. S. at 153-154. Indeed any "absolute" right to terminate a pregnancy would be an anomaly in our legal system. Speaking to this question, one commentator has observed, "Do not 'women's rights' have to be set in the framework of the full spectrum of human rights — species-rights, body-rights, etc. — thus subjecting them to the possible claims of other human rights? It is one thing to emancipate women from discrimination and male tyranny; it is quite another to emancipate them from all human claims and obligations toward the rights of others. But to claim or presume an absolute right to abortion or to make 'women's rights' absolute is to create a set of rights for women subject to none of the normal limitations of life in human community." Callahan, Abortion: Law, Choice and Morality, 464 (1970). See *id.* at 466-467.

determination as indicated by the statutes from other States cited in the majority opinion. In the absence of such guidelines, however, I believe it is the duty of the court to deal with the question on the facts before it as best it can. The interests of the mother in this case were certainly significant but they were in large measure temporary. The husband stood ready to assume at birth the responsibility for the care and raising of his child. He furthermore was willing to defray all the medical expenses of the pregnancy and the delivery. The wife's association with and responsibility for the child could have ended at birth. There was medical testimony that no unusual medical risks or complications were to be anticipated. I do not for a moment wish to minimize the very serious burden which would be imposed on the wife. The physical discomfort and inevitable risks to health in carrying the pregnancy to term are significant. There is also the distinct possibility of psychological damage lingering even after the birth. But a major part of the interest of the pregnant wife must be the continuing responsibility for the welfare of the child. *Roe* v. *Wade*, 410 U. S. 113, 153 (1973). That part of the interest, at least, is not present in this case. On the other hand the injury to the husband in terminating the pregnancy is unmistakably palpably permanent. There is no speculation, no question, that the husband will never experience the satisfaction, the comfort, the affection, or the sense of fulfilment which might have been provided him by the birth and growing up of the child whose life he petitioned this court to assure. On this record I believe the balance of perceptible interests falls in favor of the potential father. I would have granted the injunction prayed for.