COMMONWEALTH *vs.* KENNETH EDELIN.

Suffolk.    April 5, 1976. — December 17, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER, KAPLAN,
& WILKINS, JJ.

*Homicide. Wanton or Reckless Conduct. Doctor. Abortion. Con-
stitutional Law,* Abortion. *Pleading, Criminal,* Indictment, Bill of
particulars. *Practice, Criminal,* Variance. *Evidence,* Wanton or
reckless conduct, Live birth. *Words,* "Wanton," "Reckless."

At the trial of a physician on an indictment charging manslaughter in
connection with his performance of an abortion by hysterotomy,
there was insufficient evidence that the physician's conduct was
wanton or reckless to warrant submission of the case to the jury,
and his motion for a directed verdict of acquittal should have been
granted. [510-517] HENNESSEY, C.J., dissenting in part.

At the trial of a physician on an indictment charging manslaughter in
connection with his performance of an abortion by hysterotomy,
there was insufficient evidence to permit a jury to find that there
was a live birth, an indispensable element for conviction of man-
slaughter. [517-520] Per BRAUCHER, KAPLAN, and WILKINS, JJ.

At the trial of a physician on an indictment charging manslaughter in
connection with his performance of an abortion by hysterotomy,
where the indictment as particularized by the Commonwealth as-
serted that the fetus died either in utero or when partially removed
and that the homicidal act occurred while the fetus was in utero,
but the judge's charge to the jury required a live birth for convic-
tion and either confined the jury to or allowed the jury to consider
postnatal conduct as the basis for conviction, the prejudicial diver-
gence between the particularized indictment and the instructions re-
quired a directed verdict of acquittal. [520-524] Per BRAUCHER,
KAPLAN, and WILKINS, JJ.

INDICTMENT found and returned in the Superior Court
on April 11, 1974.

The case was tried before *McGuire,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*William P. Homans, Jr., & Charles R. Nesson (David
Rosenberg, Judith M. Mears,* of Connecticut, *& Jeanne
Baker* with them) for the defendant.

Commonwealth *v.* Edelin.

*Newman A. Flanagan,* Assistant District Attorney (*Alvan Brody, Joseph I. Mulligan, Jr., & Jacqueline M. Nolan-Haley* with him) for the Commonwealth.

*Leo Pfeffer,* of New York, *& Morris S. Shubow* for American Ethical Union & others, amici curiae, submitted a brief.

*Rhonda Copelon & Nancy Stearns,* both of New York, for Center for Constitutional Rights & another, amici curiae, submitted a brief.

*Judith M. Mears,* of Connecticut, *& Frank Susman,* of Missouri, for Certain Medical School Deans, Professors, and Individual Physicians, amici curiae, submitted a brief.

*Nancy Gertner, John Henn, David R. Schaefer, & John Reinstein* for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*Roger P. Stokey* for League of Women Voters of Massachusetts & another, amici curiae, submitted a brief.

*Jack Greenberg, James M. Nabrit, III, Marilyn Holifield, David E. Kendall, Peggy C. Davis, & Linda Greene,* all of New York, for NAACP Legal Defense and Educational Fund, Inc., amicus curiae, submitted a brief.

*Sarah C. Carey,* of the District of Columbia, for National Medical Association, Inc., amicus curiae, submitted a brief.

*Roger P. Stokey, Harriet F. Pilpel, & Eve W. Paul* for Planned Parenthood Federation of America, Inc. & others, amici curiae, submitted a brief.

KAPLAN, J.   On October 3, 1973, the defendant Dr. Kenneth Edelin, Chief Resident in obstetrics and gynecology at Boston City Hospital, performed an abortion by hysterotomy on a seventeen year old, unmarried woman, she and her mother having requested an abortion and consented to the operation. For his conduct in connection with the operation, Dr. Edelin was indicted for manslaughter, and convicted after trial. He appeals from the judgment of conviction and from the trial judge's refusal of a new trial.[1]

[1] After the appeal, which is within G. L. c. 278, §§ 33A-33G, was lodged in the Appeals Court, the Commonwealth applied for direct appellate review, and the application was granted.

Commonwealth *v.* Edelin.

All six Justices who heard the appeal, holding that there was error in the proceedings at trial, vote to reverse the conviction.[2] Five Justices also vote to direct the entry of a judgment of acquittal; the Chief Justice, dissenting in part in a separate opinion, would order a new trial. The five Justices[3] are agreed that there was insufficient evidence to go to a jury on the overarching issue whether Dr. Edelin was guilty beyond a reasonable doubt of the "wanton" or "reckless" conduct resulting in a death required for a conviction herein and that motions for a directed verdict of acquittal should have been granted accordingly. Three of the five Justices[4] would reach the same result of reversal and acquittal on each of the additional, independent grounds (a) that there was insufficient evidence to go to a jury of a live birth, an indispensable element for conviction of manslaughter, (b) that there was prejudicial divergence between the accusation against Dr. Edelin and the instructions to the jury. The two other Justices in a separate opinion explain their concurrence on the issue of wanton or reckless conduct; they decline to accept ground (a) or (b).

## I. THE TRIAL

A. *The Setting.* For many years a criminal abortion statute (G. L. c. 272, § 19) had had the effect in the Commonwealth of punishing as a crime the performance of any abortion except when carried out by a physician "in good faith and in an honest belief that it [was] necessary for the preservation of the life or health of a woman."[5]

---

[2] Justice Liacos had not joined the court when the appeal was argued.

[3] Justices Reardon, Quirico, Braucher, Kaplan, and Wilkins.

[4] Justices Braucher, Kaplan, and Wilkins.

[5] The exception was engrafted on the statute by the decisions of the court. See *Kudish* v. *Board of Registration in Medicine,* 356 Mass. 98, 99-100 (1969). The statute read as follows: "Whoever, with intent to procure the miscarriage of a woman, unlawfully administers to her, or advises or prescribes for her, or causes any poison, drug, medicine or other noxious thing to be taken by her or, with the like intent, unlaw-

Similar prohibitory legislation existed in other States.[6]

On January 22, 1973, the Supreme Court of the United States decided the cases of *Roe* v. *Wade,* 410 U.S. 113, and *Doe* v. *Bolton,* 410 U.S. 179. These decisions not only "rendered inoperative" our criminal abortion statute, as we had occasion to say in *Doe* v. *Doe,* 365 Mass. 556, 560 (1974), but introduced a new regime affording constitutional protections as follows (quoting from *Wade,* 410 U.S. at 164-165):

"(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

"(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

"(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."

Thus a physician is constitutionally protected in performing an abortion during the nine months of the patient's pregnancy except as the State may have acted to regulate the matter — more precisely, regulated the matter to promote its "interest in the health of the mother" after the first trimester, or to promote its "interest in the

fully uses any instrument or other means whatever, or, with like intent, aids or assists therein, shall, if she dies in consequence thereof, be punished by imprisonment in the state prison for not less than five nor more than twenty years; and, if she does not die in consequence thereof, by imprisonment in the state prison for not more than seven years and by a fine of not more than two thousand dollars."

[6] See *Roe* v. *Wade,* 410 U.S. 113, 118 n.2 (1973).

potentiality of human life" after the stage of viability. The *Wade* opinion also states, "Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks," and that at viability the fetus is "potentially able to live outside the mother's womb, albeit with artificial aid," and "presumably has the capability of meaningful life outside the mother's womb." *Id.* at 160, 163.[7]

Following the *Wade-Bolton* decisions, our Legislature began to deliberate whether and how it might "choose" to intervene and regulate the subject, and comprehensive legislation was formulated and was finally adopted as G. L. c. 112, §§ 12H-12R, in August, 1974.

The record shows, as could be expected, that requests for abortions multiplied at Boston City Hospital after the *Wade-Bolton* decisions came down. The practice of the hospital regarding the conditions for accepting patients for abortion was materially liberalized. It was in the interim between the new *Wade-Bolton* dispensation and the enactment of the State legislation that the patient here was accepted for the abortion procedure.

B. *Summary Statement.*[8] 1. *Basic circumstances.* Some days before September 30, 1973, the patient appeared with her mother at the outpatient clinic at Boston City Hospital requesting an abortion. Dr. H. R. Holtrop, chief of the outpatient OBS/GYN service, interviewed the patient and advised her about alternatives to abortion, which she did not accept. He then inquired about her last menstrual period. She placed it at a date which would indicate she was seventeen weeks gone. After physical examination, Dr. Holtrop concluded that the gestational age was twenty weeks. He then advised and approved abortion by the saline method (a common method in use for abortions in

---

[7] On "viability," see also *Planned Parenthood of Cent. Mo.* v. *Danforth,* 428 U.S. 52, 63-65 (1976) & n.29 *infra.*

[8] Some evidence beyond that in the summary will be referred to at later places in the opinion as may be appropriate.

the second trimester), and introduced Dr. Edelin as the surgeon who would carry out the procedure.[9]

At the patient's admission to hospital on September 30, a student entering his third year at medical school worked up the history and examined the patient. He estimated a gestational age of twenty-four weeks but, because of his lack of clinical experience, he put that as only a guess. Dr. Enrique Gimenez-Jimeno, a junior resident, also examined the patient and estimated twenty-four weeks; he recorded finding a fetal heartbeat. On October 1, Dr. Holtrop, with the two estimates before him, reëxamined the patient; he concluded that the period was twenty-one to twenty-two weeks.[10]

On October 2 the patient was brought to the "saline unit" for abortion by amniocentesis with saline infusion, a process of inducing fetal death and a miscarriage by introducing a salt solution into the amniotic sac containing the fetus. Dr. Edelin, with all prior estimates before him, made his own measurement and estimated the gestational period as twenty to twenty-two weeks. Proceeding in the usual way, Dr. Edelin inserted a long needle through the abdominal skin at a selected, locally anesthetized spot, hoping to reach into the amniotic sac and to drain off clear amniotic fluid; salt solution would then be let into the sac. The needle, however, recovered a bloody tap; and the result was the same on further tries. This indicated that the

---

[9] Dr. Edelin, thirty-five years of age, was a 1961 graduate of Columbia College. After teaching school for a time, he entered Meharry Medical College, graduating in 1967. After internship at an Air Force hospital and further service as a medical officer in Europe with considerable work in OBS/GYN, Dr. Edelin started as a resident at Boston City Hospital in July, 1971, and became Chief Resident in July, 1973.

[10] There is reason to think that Dr. Holtrop's method of measuring the distance from the symphysis pubis to the fundus of the uterus, by tape measure, was likely to be more accurate than fingers' breadth measurement from the umbilicus to the fundus. It was noted, also, that Dr. Gimenez had not taken the precaution of having the patient void her bladder before he made his estimate: a failure of evacuation could distort the estimate upwards.

needle had not gone true into the amniotic sac. To intro-
duce salt solution elsewhere than in the sac might en-
danger the patient. Dr. Edelin surmised that he was
dealing with an anterior placenta, i.e., one connected to
the front of the uterine wall, a condition that could ac-
count for his recovering the bloody taps.

Accordingly, Dr. Edelin discontinued his probes and
consulted Dr. James F. Penza who as associate director
of the OBS/GYN department was his supervisor. It was
agreed that Dr. Penza would himself attempt amniocen-
tesis the following morning and, if that failed, Dr. Edelin
would perform a hysterotomy. On October 3, Dr. Penza
made the further attempts but they failed. Thereupon Dr.
Edelin went forward with the other agreed procedure.

The abortion by hysterotomy involved incision of the
uterus to reach and remove the products of conception.
In about ten minutes' time after the patient received gen-
eral anesthesia, Dr. Edelin commenced incising through
the abdominal wall to reach the uterus. As he had diag-
nosed an anterior placenta, he made a low transverse cut
just above the pubic hairline. The process of incising,
retracting, and so forth was laborious and took perhaps
thirty minutes. Reaching the uterus, Dr. Edelin made a
transverse incision of about six to seven centimeters, a
relatively small cut: the lower part of the uterus is thick
at twenty to twenty-two weeks and excessive bleeding was
to be avoided. Dr. Edelin reached into the incision with
the index and middle fingers of his left hand, steadying
the uterus with his right hand. He swept the uterine cavity
with his fingers to detach the placenta from the uterine
wall; then he began to peel the amniotic sac, intending
to recover the sac intact through the incision, the rest to
follow. As he brought his fingers behind the sac and began
to ease the sac through the incision, the sac ruptured.
Dr. Edelin then sought to take hold of a lower extremity
of the fetus in order to draw the fetus through the uterine
incision. This was difficult because of the size and location
of that incision.

Upon removal of the fetus, Dr. Edelin put his hand on

its chest wall for a few seconds; finding no heartbeat or other sign of life,[11] he placed the fetus in a stainless steel basin held for the purpose by an attending nurse. He turned his attention promptly to the patient with the open uterine incision. After removing any remaining material in the cavity, and swabbing the cavity and taking other indicated steps, he undertook the suturing process and concluded the procedure. The patient recovered without incident.

The fetus and placenta were transferred to the pathology laboratory according to usual practice on the morning of the operation. The resident pathologist weighed the fetus twice and recorded 600 grams (one pound, five ounces). For preservation, the fetus and cord were placed in formalin, a ten per cent solution of formaldehyde.

2. *The question of the condition and potentiality of the fetus.* A large amount of testimony was admitted on these subjects which on the part of the prosecution ran thus. As against the pathologist's weigh-in of the fetus at 600 grams just after the operation, the medical examiner, Dr. George W. Curtis, at an autopsy on February 12, 1974, found a weight of 693 grams for the fetus, seven grams for the umbilical cord (one pound, eight and one-half ounces total), and it was his opinion that the fact that the fetus had been soaking for more than four months would not have increased the weight and might have reduced it. Individual organs were weighed separately. There was evidence also as to the crown-to-heel and crown-to-rump length of the fetus (respectively 33.5 and 21 centimeters). The weight and length figures were related to sundry published tables in order to support estimates about the gestational age of the fetus.

Evidence was admitted about the condition of the fetal lungs and the possibility of respiratory activity by the fetus. According to Dr. Curtis, the lungs sank in water and

---

[11] See the confirming testimony on this point by Dr. Gimenez, at 506-507, 511-512 *infra.*

had a solid appearance, indications of the absence of respiratory movement. Microscopic examination of lung tissue later fixed on slides, however, showed partial expansion of some of the alveoli. This suggested respiratory activity, but left the question where it had taken place. Dr. Curtis's testimony is fairly read as allowing any of three possibilities: that the fetus had sucked amniotic fluid (as it might have done when distressed), or had taken in room air through the uterine incision, or had done so after delivery clear of the uterus. The last might betoken postnatal "life" in some sense.

Dr. John F. Ward, a pathologist, testified on the basis of his microscopic examination of lung tissue that the fetus "did breathe outside the uterus." His adoption of the third alternative appears based at least in part on his skepticism about the phenomenon of respiratory movement in utero incident to the sucking of amniotic fluid; in this he seemed to stand somewhat apart from other experts.

Their analysis of post mortem materials or data led experts for the Commonwealth[12] to put the gestational age at the time of the operation at twenty-four weeks, excepting Dr. Ward who went somewhat higher to twenty-six weeks. All recognized that the figures were only estimates. Several prosecution experts would answer in the affirmative the inferential question of "viability" of the fetus at the time of the operation.[13] The exact import of such judgments turned on the meaning to be ascribed to that term. Here the testimony was diverse, with one Commonwealth witness going so far as to say that a fetus was to be considered viable if it had any chance of surviving, and another expert stating that a fetus was viable if it could survive for one moment outside the uterus, which might

---

[12] Drs. Denis Cavanagh, George W. Curtis, Joseph Kennedy, Jr., Fred E. Mecklenburg, and Norman L. Virnig.

[13] Defense experts, Drs. Allan Barnes, Jeffrey B. Gould, Charles H. Hendricks, Arthur T. Hertig, and Jack Pritchard testified that in their respective opinions the fetus was not viable.

be the case with a fetus of twelve weeks' age.[14] In this connection (as in other respects later mentioned[15]) the judge allowed very considerable latitude for the expression by witnesses of medical ideas which he did not relate or channel back to legal standards. For example, the judge did not bring to bear during trial (or, for that matter, in his charge to the jury) the Supreme Court's definition of viability in the relevant sense of the point at which the State might, if it chose, constitutionally assert its interest in bringing the fetus to full term.

3. *The question of homicidal conduct.* We can find no dispute in the testimony about the proposition that the established procedure ("protocol") for abortions by hysterotomy at Boston City Hospital accepted and envisaged detachment of the placenta as the first surgical move after completion of the uterine incision, with subsequent peeling of the amniotic sac. On the part of the prosecution, there was testimony tending to show that a reverse procedure, resembling Caesarean section performed when a fetus approached or reached term, was possible and might have been preferable, especially with a fetus of a gestational age approximating that present here: this procedure would involve first breaching the amniotic sac and removing the fetus, then separating the placenta. There was also testimony critical of the relatively small size of the uterine incision which may have caused the rupture of the amniotic sac.

Dr. Gimenez testified that he walked into the operating room when the operation was under way. He said he saw Dr. Edelin's sweeping motion, evidently the one detaching the placenta, after which, he said, Dr. Edelin remained motionless for at least three minutes with his hand in the uterus, his eyes fixed on a clock on the wall. He said, further, that all others in the room — the anesthetist, student assistant, and nurses — also remained still with

---

[14] The testimony of Drs. Kennedy and Virnig is illustrative.

[15] See 522-523 *infra.*

their eyes on the clock. Then Dr. Edelin delivered the fetus from the uterus. The interval of immobility as testified to by Dr. Gimenez appeared to start immediately after the detachment of the placenta and to end with the delivery of the fetus; the testimony did not refer to any space of time that might cover detachment of the amniotic sac, rupture of the sac with spill of fluid, and grappling for an extremity of the fetus in order to accomplish the withdrawal.

Dr. Gimenez testified that the fetus appeared dead on delivery. With regard to the testing for heartbeat extra utero, an expert called by the defense stated his opinion that ten seconds would be required to reach certainty about the existence of a heartbeat.

C. *The Accusation and Theories of Commonwealth and Defense.* We turn to the precise accusation.[16] The short-form manslaughter indictment found by the grand jury on April 11, 1974, stated simply "that [Dr. Edelin] did assault and beat a certain person, to wit: a male child described to the . . . Jurors as Baby Boy[17] and by such assault and beating did kill the said person." The Commonwealth was required to respond to an order for particulars of the alleged manslaughter. First, as to when the death of the "person" had supposedly taken place, the Commonwealth declined the tendered proposition[18] that the death occurred "when the fetus was totally expelled or removed from the

---

[16] The manslaughter statute, G. L. c. 265, § 13, as appearing in St. 1971, c. 426, says merely: "Whoever commits manslaughter shall be punished by imprisonment in the state prison for not more than twenty years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two and one half years. . . ." The requirement for conviction of manslaughter (so called "involuntary" manslaughter) that the homicidal acts be wanton or reckless (see 499 *supra;* 508-509 *infra*) was developed by decisions of the courts.

[17] Other identification was impounded.

[18] The defense request for particulars inquired: "Does the Commonwealth claim that the death of the 'person' referred to in the indictment took place (a) when the fetus was inside the body of the mother? (b) when the fetus was partially expelled or removed from the body of the mother? or (c) when the fetus was totally expelled or removed from the body of the mother?"

body of the mother," and adopted the propositions that
death occurred "when Baby Boy was within the mother,
albeit detached from the mother and independent of the
mother, and [*sic*] . . . when Baby Boy was partially ex-
pelled or removed from the body of the mother."[19] As to
the defendant's supposed act claimed to constitute the
manslaughter, the Commonwealth particularized that Dr.
Edelin's "act during the course of a hysterotomy, which
act constituted manslaughter, was his waiting 3-5 minutes
after he manually separated the placenta from the uterine
wall and before he removed the person from the abdominal
cavity of his mother."

From the indictment as particularized, it appeared that
the Commonwealth's theory was that, upon the detach-
ment of the placenta, the fetus became a "person" within
the manslaughter statute, and was then killed by a wanton
and reckless act of Dr. Edelin, all before the birth of the
fetus through its complete delivery clear of the mother's
body. The defense asserted by repeated motions that such
an accusation would be an untenable usage of the man-
slaughter statute and would, besides, enable the Common-
wealth to evade or subvert the constitutional rule of
*Wade-Bolton.* The defense contended that manslaughter
could be made out, if at all, only where a fetus was born
alive completely outside the mother's body and was homi-
cidally destroyed by acts committed at that stage.

The defense did not persuade the trial judge to limit the
case as just indicated and to confine the evidence accord-
ingly. (How far the judge's ultimate instructions to the
jury, which we proceed to describe, represented a shift of
position, and whether such a shift was prejudicial, are
questions considered in "Additional Views of Three Jus-
tices," at 520 *infra*.)

D. *The Judge's Instructions to the Jury.* The judge
charged that the "wanton" or "reckless" conduct that had
to be proved for conviction of manslaughter predicated a

---

[19] A defense motion to strike the particulars given as being internally
inconsistent (and for other reasons) was denied by the court.

frame of mind more egregious or corrupt than that for
"negligence" or "gross negligence"; there must be proof
of "indifference to or a disregard of the probable conse-
quences to the rights of others." All this was consistent
with *Commonwealth* v. *Welansky,* 316 Mass. 383, 396-401
(1944).

As to the further necessary ingredients of the offense in
the particular case, the judge began by saying that man-
slaughter was "inextricably intertwined" with the *Wade-
Bolton* decisions. He quoted the Supreme Court's (a)-
(b)-(c) summary in *Wade* (set forth at 500 *supra*). *Wade-
Bolton,* he said, struck down the existing Massachusetts
laws on abortion, and on the critical date, October 3, 1973,
the Commonwealth had not taken any steps to regulate
the subject. By abortion was meant the termination of
pregnancy at any stage during the nine months, and in
the absence of any regulatory statute "the abortion process
and its effectuation must be left to the medical judgment
of the pregnant woman's attending physician."

The manslaughter statute could apply only as follows.
Only when a fetus had been born alive outside its mother
could it become a "person" within the meaning of the
statute. Thus, to be convicted of the crime, Dr. Edelin
must be found — by reckless or wanton acts — to have
"caused the death of a person who had been alive outside
the body of his or her mother," "caused the death of a
person, once that person became such." We set out this
part of the charge in full text:

> "A fetus is not a person, and not the subject of an
> indictment for manslaughter. In order for a person to
> exist, he or she must be born. Unborn persons, as I said,
> are not the subject of the crime of manslaughter. Birth
> is the process which causes the emergence of a new
> individual from the body of its mother. Once outside the
> body of its mother, the child has been born within the
> commonly accepted meaning of that word.
>
> "Killing or causing the death of a person who is born
> alive and is outside the body of his or her mother may

be the subject of manslaughter. In order for the defendant to be found guilty in this case, you must be satisfied beyond a reasonable doubt, as I have defined that term for you, that the defendant caused the death of a person who had been alive outside the body of his or her mother. If you believe beyond a reasonable doubt that the defendant, by his conduct, caused the death of a person, once that person became such as I have defined the word for you, you may find the defendant guilty of the crime of manslaughter, if that death was caused by wanton or reckless conduct on the part of the defendant. If, on the other hand, you do not find beyond a reasonable doubt that the defendant by his conduct caused the death of a person, then you must acquit him of the crime charged."

Two more points. "Born alive": As to what birth meant, the judge said it was "the process which causes the emergence of a new individual from the body of its mother." The judge, however, did not discuss the meaning of "alive" — how far this connoted an ability to survive, under what conditions, for what length of time.

"Viability": The judge left it to the jury in their "consideration of the facts of this case" to "determine" whether viability had "any applicability." If they determined that it did, it should be taken to mean "the ability to live postnatally." The judge, however, did not discuss what the chances, conditions, or duration of survival must be.

After receiving the charge, the jury returned a verdict of guilty. Dr. Edelin was sentenced by the judge to one year's probation, execution of the sentence being stayed pending appeal.

## II.    INSUFFICIENT EVIDENCE OF "WANTON" OR "RECKLESS" CONDUCT TO GO TO A JURY

For purposes of the present point, we assume there was sufficient evidence to entitle the jury to find a "live" birth, in some sense of that term, and subsequent death, as re-

quired for conviction of manslaughter under the judge's charge.

But what acts of Dr. Edelin could be taken into account in deciding his guilt or innocence of manslaughter? Although the judge's charge is not crystal clear on the matter, we read his charge as meaning, and certainly capable of being understood to mean, that only acts of Dr. Edelin after the birth could constitute the conduct required for conviction of the crime. Thus: "caused the death of a person who had been alive outside the body of his or her mother," "caused the death of a person, once that person became such." As the defense has argued, these phrases are cast in the "past perfect." The starting point of the duty owed by the defendant under the manslaughter statute was thus set at the stage after delivery from the mother, and attention centers upon the "heartbeat test" evidence. Taking the evidence on this point in a light favorable to the Commonwealth (see *Commonwealth v. Kelley,* 370 Mass. 147, 149-150 [1976]; G. L. c. 278, § 11), we find nothing of substance in it to permit a submission to a jury as to criminal "recklessness" or the like.

Although the fetus may have been alive in the very narrow sense that there was some postnatal gasping of air as revealed by microscopic analysis of preserved lung tissue long after the event, nothing of the sort was observable by Dr. Edelin as he carried out the operation. To all appearances, the fetus was dead. Dr. Edelin found no heartbeat and saw no other indication that he had a live being in his hands. If we give the prosecution the benefit of a remark by a defense witness that a test for heartbeat, to be absolutely conclusive, should extend longer than the few seconds testified to by Dr. Edelin, we have to note — besides the fact that there was no evidence as to any standard practice in this regard — that the witness did not say, nor could he say plausibly, that to test for the short period would be wanton or reckless behavior in any and all circumstances of a delivery. Here Dr. Gimenez, an eyewitness, joins in Dr. Edelin's observation. Dr. Gimenez testified: "The baby [*sic*] was dead"; it "had no signs of

life, such as breathing or movement." Dr. Gimenez had no criticism of the defendant on the score of his postnatal conduct.

The Commonwealth tries to avoid the evident result by contending that the judge's charge should be read so as to allow consideration of Dr. Edelin's conduct during the prenatal stage. As already noted, we do not agree with that attempted interpretation.[20] In all events, such an interpretation would go counter to the law by which Dr. Edelin is to be judged, because, as we shall indicate, (i) it is very doubtful whether the manslaughter statute spoke to prenatal conduct, and (ii) if it purported to do so, it would be displaced pro tanto for purposes of the present case by the constitutional doctrine of *Wade-Bolton.* But the further answer is (iii) that Dr. Edelin's conduct from start to finish, both prenatal and postnatal, did not provide a basis for submission to a jury of the issue of "recklessness" or the like.

Manslaughter assumes that the victim was a live and independent person. This is well understood,[21] and the judge so charged. Destruction of a fetus in utero is not a manslaughter. The further question was debated at common law[22] whether manslaughter might rest on a defendant's injuring a fetus in utero, where the fetus was later born alive, and then died of the injury without further guilty intervention by the defendant. In this Commonwealth, Holmes, J., seems to intimate a preference for the view that the prenatal acts could not ground a manslaughter despite the later live birth and death. *Dietrich* v. *Northampton,* 138 Mass. 14, 15, 17 (1884). (Common

---

[20] We need not underscore the seriousness of a possible conclusion that the judge's charge was actually ambiguous on the point and could be understood either way by individual jurors.

[21] See Annots., Proof of Live Birth in Prosecution for Killing Newborn Child, 65 A.L.R.3d 413 (1975); Homicide Based on Killing of Unborn Child, 40 A.L.R.3d 447 (1971).

[22] The curious will find more extended discussion of the common law in the learned briefs of counsel.

sense, besides common law, tended to support this position, for if a contrary rule were adopted, a putative defendant might be encouraged to make sure he extinguished the fetus while still in utero.) The effect, be it noted, was not to let the defendant off, but to subject him to the typical criminal abortion statute. See note 5 *supra; Dietrich* v. *Northampton, supra* at 17. Cf. *Keeler* v. *Superior Court of Amador County,* 2 Cal. 3d 619, 635-636 (1970).[23]

But if acts of a defendant during the prenatal period could ever be availed of in obtaining a conviction of manslaughter, that was a legal impossibility in the circumstances of this case after the *Wade-Bolton* decisions. (Thus our reading of the judge's charge is actually required to keep it within constitutional bounds.) Under *Wade-Bolton,* the State's regulation of abortions after viability to promote its interest "in the potentiality of human life" is expected to be expressed in "tailored" legislation. See *Wade,* 410 U.S. at 164-165. The detail that may be involved, representing an adjustment and accommodation of many considerations, is exemplified by the comprehensive legislation in fact adopted by our Legislature in August, 1974.[24] The manslaughter statute is flat and contains no such detail, and it would be not only incongruous but, we think, unconstitutional to attempt to bring it to bear on a physician as he went about the predelivery process of performing an abortion. After *Wade-Bolton,* even if not be-

---

[23] For the quite distinguishable development of civil liability for injuries to a fetus, see *Mone* v. *Greyhound Lines, Inc.,* 368 Mass. 354 (1975).

[24] The legislation (G. L. c. 112, §§ 12H-12R), among other things, defines "abortion"; states the judgments required to be made by the physician in undertaking an abortion before twenty-four weeks of pregnancy, and the judgments to be made after that period; describes conditions to be maintained, standards to be observed, and procedures to be followed during the performance of abortions; and lays down reporting requirements. (Of course, we intimate no opinion here as to the validity of any of these details.) See Bryant, State Legislation on Abortion after *Roe* v. *Wade:* Selected Constitutional Issues, 2 Am. J. Law & Med. 101 (1976).

fore, the manslaughter statute could take hold only after
a live birth and only with respect to acts of the physician
in the postnatal period.

If the manslaughter statute conceivably could be uti-
lized to control and punish a physician's conduct in the
prenatal period, then the judge would be bound to say
just how the statute should be applied consistently with
*Wade-Bolton.*[25] The most obvious of the several matters
calling for guidance by the trial judge would be a definition
or description of viability marking the stage at which a
physician would begin to owe a duty to the "potentiality
of human life" inherent in the fetus.[26] On this point, as our
digest of the judge's charge indicates, the instructions were
uninstructive and left a wide-open option to the members
of the jury.[27]

However, that omission from the charge does not em-
barrass a decision to reverse and acquit because, on any
view of viability tenable under *Wade-Bolton,* there was no
sufficient showing of recklessness in Dr. Edelin's prenatal
conduct — any more than in his postnatal conduct[28] —
to permit reference of the question to a jury. His "quo

---

[25] The judge would be bound to give these instructions; but it should
be noted that applying the manslaughter statute in that fashion would
be novel and would encounter serious trouble in meeting the argument
that it could be done only with prospective effect. See *Bouie* v. *Colum-
bia,* 378 U.S. 347 (1964); *Douglas* v. *Buder,* 412 U.S. 430 (1973).

[26] Of course, *Wade-Bolton* does not itself create any such duty; the
time for commencement (after viability) and the nature of the duty
are for the State to decide. These are plainly issues for settlement by
legislation; on what basis could a judge resolve them? This shows the
fancifulness of any idea that, during the period between *Wade-Bolton*
and the adoption of legislation, there could be a valid conviction for
manslaughter based on a physician's acts during the prenatal period.

[27] The judge's omission of a definite instruction on viability is in it-
self consistent with an intention on his part to confine possible crimi-
nality to acts during the postnatal period.

[28] If both phases of Dr. Edelin's conduct are to be considered, we
should begin with his efforts at amniocentesis with saline infusion. It
is a telling, if somewhat ironic, fact that had that procedure succeeded
in producing miscarriage, a prosecution for manslaughter could not
have been maintained either on the Commonwealth's original theory or
on the one submitted to the jury in the charge.

animo" turned on whether he believed in good faith that the fetus was not viable at the time of the operation and was not palpably unreasonable in this belief — a combination of an internal and an external standard of criminality. See *Commonwealth* v. *Welansky*, 316 Mass. at 398-399, referring to *Commonwealth* v. *Pierce*, 138 Mass. 165 (1884). Of course manslaughter could not be supported by proof merely of a mistake of judgment, even if that was the result of negligence or gross negligence.

The record shows that Dr. Edelin, as Chief Resident in OBS/GYN at Boston City Hospital, was well aware of the *Wade-Bolton* decisions and accordingly believed (correctly) that abortion was not automatically excluded at the stage of viability — that was for the Legislature to decide. He was concerned about viability, however, because it affected medical judgments and because he had a personal scruple against aborting a viable fetus.

Again considering the evidence in a light favorable to the Commonwealth, there is nothing to impeach the defendant's good faith judgment that the particular fetus was nonviable, and nothing to suggest that that belief was grievously unreasonable by medical standards.[29] An independent judgment would be required of Dr. Edelin as surgeon in the case, and his independent estimate of twenty to twenty-two weeks of gestation was consistent with the double-checked estimate of the experienced chief of clinic. The bona fides of Dr. Edelin's estimate is perhaps reinforced by the fact that he used a relatively small uterine incision. We find nothing in the course of the operation which might have alerted him to the probability that he had been mistaken in his estimate. It is not shown that he was mistaken in fact. Prosecution and

---

[29] In *Planned Parenthood of Cent. Mo.* v. *Danforth*, 428 U.S. 52, 63-65 (1976), the Court said it had recognized in *Wade* "that viability was a matter of medical judgment, skill, and technical ability, and we preserved the flexibility of the term." The Court also noted that "[t]he time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician."

defense experts divided on whether the fetus was viable, but a trier's belief in one set of experts would not begin to show that Dr. Edelin's judgment the other way was reckless. All the testimony bears comparison with the indication in *Wade* about a twenty-eight to twenty-four weeks gestational age in relation to viability. It is to be borne in mind, also, that no witness was prepared to state that this fetus had more than the remotest possibility of meaningful survival.

If we accept, as we think we must, that there was nothing to show Dr. Edelin believed the fetus to be viable, or was flagrantly mistaken in believing it to be nonviable, then even a three to five minute wait after detachment of the placenta would not count as recklessness because Dr. Edelin would think it indifferent to the possibility of meaningful survival.

But to follow the operation more closely: The criticisms by Commonwealth witnesses of the protocol of commencing the hysterotomy with detachment of the placenta,[30] and of fixing the size of the particular uterine incision, were in the area of debate and, far from showing a criminal intent, did not reflect seriously on Dr. Edelin. Dr. Gimenez's testimony is fairly reconcilable with Dr. Edelin's: the pause Dr. Gimenez spoke of may well have been the interval of the delay in delivering the fetus that was due to the rupture of the amniotic sac.[31] However that may be, criminal recklessness is not in the picture if one starts with an understanding of Dr. Edelin's belief and judgment as to viability.

If any doubt remains that there was no case for the jury on the question of recklessness, two special factors in the present situation should be considered.

[30] In one respect Dr. Edelin did not follow the hospital protocol: he did not make a careful contemporaneous record. It is fair to add that the demands on the time and resources of the defendant and other staff members after the decision of *Wade-Bolton* were very formidable.

[31] It is unnecessary to comment on the reliability of Dr. Gimenez as a witness (i.e., his opportunity and capacity to observe) which was attacked by the defense.

First, we deal here with the professional judgments of a qualified physician acting under stress at the operating table. The Supreme Court has cautioned in the abortion cases against the undue trammeling of judgments of the individual attending physician. In *Bolton* the Supreme Court struck down a *statutory* scheme for *advance* review of the attending physician's judgment by a panel of other *physicians* who would be conscious of the need to preserve the independence of the individual physician. (See *Bolton,* 410 U.S. at 195-200.) In the present case we have an attempted post hoc review of the attending physician's judgments through a battle of experts before a lay jury with a threat of criminal conviction and professional disgrace.

Second, we deal here with the constitutional right of privacy of the patient and the correlative constitutional right of the physician — rights to which the Supreme Court has assigned very high value.

There should be caution and circumspection in the interpretation and application of a criminal statute which, as employed here, must necessarily trench on professional practice and constitutional freedoms. This implies a wariness in assessing the strength of a criminal case made against a physician before it is held that there is enough evidence to submit to a jury.[32]

## III. ADDITIONAL VIEWS OF THREE JUSTICES

A. *Insufficient Evidence of Live Birth to Go to a Jury.* Whether Dr. Edelin was reckless or wanton in dealing with the fetus is a question of what he believed and how he exercised judgment. There is a further and different question, whether in fact the fetus was born alive outside the mother's body.

Under the judge's charge, there could be no subject of manslaughter unless and until the fetus was live born. The

---

[32] Our negative conclusion regarding recklessness does not imply any positive judgment regarding negligence, simple or gross. That question is not before us and we may not venture an opinion on it.

charge on this point might be accepted as framing the "law of the case" even if it were erroneous (see *Commonwealth* v. *Graves,* 363 Mass. 863, 868 [1973], and cases cited; *Commonwealth* v. *Richards,* 363 Mass. 299, 307 [1973]), but it is quite plain that the charge was correct.[33] The Commonwealth's original submission that the manslaughter statute should be read to cover the destruction in utero of a "detached" fetus, amounted merely to a misguided attempt, despite *Wade-Bolton,* to reconstitute the old criminal abortion statute under the guise of manslaughter.

Without repeating the evidence on the question of live birth, we may note that the eyewitness testimony of Dr. Gimenez (confirming Dr. Edelin's testimony) was that the fetus was delivered dead. The only evidence suggestive of postnatal life came from examination of the preserved lungs. Gross examination of the lungs by the medical examiner indicated still birth, not live birth, and it was only on microscopic examination of the tissue that any hypothesis of "breathing" could arise. But the breathing, assuming there was any, must be shown to have occurred outside the mother; support for this could be found in the testimony of Dr. Ward, but that was rather equivocal.[34]

If full marks should nevertheless be given Dr. Ward's testimony, that is, if it be assumed that it provided enough

---

[33] See note 21 *supra.* The singular case of *People* v. *Chavez,* 77 Cal. App. 2d 621 (Dist. Ct. App. 1947), has been cited to the contrary, but that involved the deliberate killing of an infant at the point of being naturally born at full term. See the limiting interpretation of the *Chavez* case in *Keeler* v. *Superior Court of Amador County,* 2 Cal. 3d 619, 636-638 (1970).

[34] If Dr. Ward's testimony that the fetus breathed air is accepted, it still seems to leave at large whether the breathing occurred before birth through the uterine incision, or after birth outside the mother's body. The substance of his testimony appears consistent with the following restatement of his testimony: "did breathe [*add here: air from*] outside the uterus." (It may be mentioned here that there was testimony by Dr. Shirley Driscoll, a pathologist called by the defense, who addressed herself specifically to the slides used by Dr. Ward, that granular matter present with protein content was more consistent with sucking of amniotic fluid than with an intake of air.)

to entitle a jury to conclude beyond a reasonable doubt that some kind of breathing did occur after the fetus was delivered from the uterus — an assumption that appears doubtful indeed — then the question must be faced whether the breathing, such as it could have been, demonstrated postnatal "life" as required for conviction under the manslaughter statute.

Postnatal life could be variously defined for the purpose, at one end of the spectrum as a capacity of the fetus, when delivered, to sustain existence for an indefinite period without artificial aid, and at the other end as a showing of any sign of activity such as a single gasp of air not observed or observable by the eye at the time, and established, if at all, by later microscopic analysis. The jury needed a standard to go by. But the trial judge did not provide a standard.[35]

This might leave the case, with respect to the present point, in a condition where a new trial would be justified, but not acquittal. Here, however, we are able to say with confidence that on no acceptable standard was there proof sufficient to go to a jury. The defense had offered a proposed instruction drawing upon the definition of "liveborn infant" as formulated and published by the Committee on Terminology of the American College of Obstetricians and Gynecologists: "LIVEBORN INFANT. Liveborn infant is a fetus, irrespective of its gestational age, that after complete expulsion or extraction from the mother, shows evidence of life — that is, heartbeats or respirations. Heartbeats are to be distinguished from several transient cardiac contractions; respirations are to be distinguished from fleeting respiratory efforts or gasps . . . ."[36] This suggested standard, which required a minimal demonstration of

[35] The judge said merely that birth was "the process which causes the emergence of a new individual from the body of its mother. Once outside the body of its mother, the child has been born within the commonly accepted meaning of that word."

[36] American College of Obstetricians and Gynecologists, Committee on Terminology, Obstetric-Gynecologic Terminology 454 (Hughes ed. 1972).

independent existence beyond "fleeting respiratory efforts or gasps," was less exacting of proof and therefore more favorable from the Commonwealth's viewpoint than the standard that has been applied in practice around the country in manslaughter cases involving newborns.[37] It commended itself by its relative objectivity, practicality, and moderation. By this standard (as by any variant that might be considered acceptable) the Commonwealth failed in its proof.[38]

B. *Prejudicial Shift from the Accusation as Specified by the Commonwealth to the Crime as Defined in the Judge's Instructions.* There were discrepancies between (i) the indictment as particularized by the Commonwealth in its response to the request for particulars and (ii) the ingredients of the crime of manslaughter as the judge described them in his instructions to the jury. The indictment as particularized asserted that the fetus died either while it was in utero or when it was partially removed; under the judge's charge, either assertion, if proved, would be incompatible with manslaughter, for conviction depended on a live birth after delivery free of the mother. Further, the indictment as particularized asserted that the homicidal act was the deliberate pause in utero immediately following the detachment of the placenta; the judge's charge confined the jury to postnatal conduct (as the defense interprets the charge) or at least allowed the jury to consider postnatal conduct as part of the basis of conviction (as the prosecution interprets the charge).

The bill of particulars had the effect of restricting the case that the Commonwealth was entitled to prove. "[T]he specification affected the indictment and restricted the

---

[37] See Annot., 65 A.L.R.3d 413 (1975), and, e.g., *Montgomery* v. *State,* 202 Ga. 678 (1947); *Logue* v. *State,* 198 Ga. 672 (1944); *Shedd* v. *State,* 178 Ga. 653 (1934); *People* v. *Ryan,* 9 Ill. 2d 467 (1956); *Jackson* v. *Commonwealth,* 265 Ky. 295 (1936); *People* v. *Hayner,* 300 N.Y. 171 (1949); *State* v. *Collington,* 259 S.C. 446 (1972); *Cordes* v. *State,* 54 Tex. Crim. 204 (1908).

[38] The conclusion is strengthened by the special factors in this case mentioned at 517 *supra.*

proof to the matters specified." *Commonwealth* v. *American News Co.*, 333 Mass. 74, 77 (1955), and cases cited. It was open to the Commonwealth within reasonable limits of circumstance and time to amend its bill. See G. L. c. 277, § 40. It did not do so. This was despite the repeated warnings sounded by the defense that on the particulars furnished there was no manslaughter. Hence it is appropriate that the Commonwealth should be held to the ground it selected.

The Commonwealth's proof, as restricted by the particulars, could not support conviction of the offense having the elements described by the judge in his instructions to the jury. Conversely, conviction must be taken to have rested on elements forming no part of the accusation as particularized. "The offense must not only be proved as charged, but it must be charged as proved." *Commonwealth* v. *Albert*, 307 Mass. 239, 244 (1940), quoting from *Commonwealth* v. *Blood*, 4 Gray 31, 33 (1855). The upshot is that the defendant in the extraordinary circumstances of this case was entitled to acquittal. *Commonwealth* v. *American News Co.*, and *Commonwealth* v. *Albert*, both *supra.* See *DeJonge* v. *Oregon*, 299 U.S. 353, 362 (1937); *In re Ruffalo*, 390 U.S. 544, 550-552 (1968). (Whether, after acquittal on such a ground, the defendant might be reindicted, raises a question of double jeopardy that would take us far afield.)

The policy of the statute on "variance," G. L. c. 277, § 35,[39] tends to support acquittal in the present case. It says that a defendant "shall not be acquitted on the ground of variance between the allegations and the proof," but this is conditioned on the "essential elements of the

---

[39] The full text of G. L. c. 277, § 35 is: "A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence. He shall not be acquitted by reason of an immaterial misnomer of a third party, an immaterial mistake in the description of property or the ownership thereof, failure to prove unnecessary allegations in the description of the crime or any other immaterial mistake in the indictment."

crime" being "correctly stated." That was not the case
here. The statute indicates, further, that even when the
condition is met, acquittal is called for where the defend-
ant was "thereby prejudiced [i.e., by the variance] in his
defence." As will be indicated below, that was the case
here.

It has been suggested that the particulars in the present
case should be taken to have been informally amended to
correspond more or less to the definition of the crime as
finally given in the instructions, because the prosecution
let it be known early on, by the time of the opening of
trial, that it intended to attempt to prove "breathing." But
especially in the face of the particulars furnished that
the homicidal act — the pause — occurred just following
detachment of the placenta, this slipshod prosecution
"notice" could well be understood to refer to proof of
intrauterine respiratory activity bearing on "viability," not
to proof of a live birth outside the mother. Quite apart
from this, however, the "notice" did not provide any warn-
ing that the prosecution was shifting ground from the
claimed homicidal pause in utero to a supposed homicidal
act or omission after birth clear of the mother.

A switchover such as occurred here may be thought
inherently prejudicial (as § 35 indeed suggests). But if
there must be a demonstration of probable prejudice, the
defense has shown it sufficiently.

The defense puts an example of prejudice through con-
fusion of the target. As noted earlier (note 31 *supra*), the
defense attacked Dr. Gimenez's credibility as a means of
challenging his testimony (which stood alone) regarding
the three to five minute wait. But the attack naturally
tended also to discredit Dr. Gimenez's further testimony,
as an eyewitness, that the fetus was dead at delivery. Yet
that testimony, if believed, would destroy the Common-
wealth's case, assuming the judge's instructions to the
jury. This is an example of how the switchover could un-
fairly confound the defense.

In another aspect, prejudice is shown. During the long
course of the case (twenty-eight trial days) a great welter

of testimony was admitted, over repeated objections, which had the effect of drenching the jury with the prosecution's theory of the case — that the fetus became a person at detachment of the placenta and was then destroyed by the surgeon's deliberate pause. Commonwealth experts expounded medical doctrine, largely of a definitional character, tending in one way or another to support that hypothesis: for example, that there was "personhood" when, after separation from the placenta, the fetus could maintain itself for any length of time on its own systems; that a fetus was to be considered viable if it was possible to project that, were it delivered at that moment, it would have any chance to survive for even an instant; that "abortion" was a procedure confined to the first twenty weeks of pregnancy; that "abortion" was related only to termination of pregnancy, and, notwithstanding any right of a woman in that regard, the physician was duty bound at all times to preserve the fetus.

It is true that the judge indicated, both during the trial and in his charge, that testimony of this kind was being received in order to orient the jury to the witness's professional manner of thought or speaking, and was not to be taken as laying down the controlling legal precepts. The first trouble with regarding this as a corrective is that there was no attempt during trial to state the critical divergence of the definitional propositions from their proper legal counterparts. An attempt of this sort was made in the final instructions but the judge's remarks (i) were very brief in relation to the voluminous and accumulative testimony, (ii) did not point out wherein the testimony differed from the proper legal norms, and (iii) left important concepts empty of definition so that the received testimony would rush in to fill the spaces, since nothing else was being supplied. This is strikingly true of "viability" which was not only left in substance undefined by the judge, but was, according to him, to be availed of by the jury "if ... you determine that the ... [term has] any applicability."

There is, then, a strong probability of prejudice in that, notwithstanding the switchover, the jury may have con-

victed Dr. Edelin on the basis of the Commonwealth's erroneous view of the case.[40]

## IV. Conclusion

This opinion does not seek an answer to the question when abortions are morally justifiable and when not. That question is wholly beyond our province. Rather we have dealt with a question of guilt or innocence under a particular statute on a particular state of facts. We are conscious that the significance of our decision as precedent is still further reduced by the fact that the case arose in an interregnum between the Supreme Court's abortion decisions of 1973 and the adoption of legislation intended to conform to those decisions — a kind of interval not likely to be repeated.

Legal relationships during that interval were hard to define with certainty. Understandably, the doubts infected the theory on which the Commonwealth went. The judge tried the case with skill and careful attention to detail, but faced unprecedented problems which he had to resolve on the spot.

In the comparative calm of appellate review, the essential proposition emerges that the defendant on this record had no evil frame of mind, was actuated by no criminal purpose, and committed no wanton or reckless acts in carrying out the medical procedures on October 3, 1973. A larger teaching of this case may be that, whereas a physician is accountable to the criminal law even when performing professional tasks, any assessment of his responsibility should pay due regard to the unavoidable difficulties and dubieties of many professional judgments.[41]

[40] The remitting of the jury to the Commonwealth's proposition, namely, that a "person" as a subject of manslaughter existed on detachment of the placenta, was powerfully, and we think, unfortunately reinforced by the admission in evidence of a picture of the fetus as it appeared after four months in formaldehyde solution. This adds to the reasons for reversal developed in the text above.

[41] The court acknowledges with thanks the submission of briefs by the following as friends of the court: American Ethical Union, Ameri-

The judgment is reversed and the verdict set aside. Judgment of acquittal is to be entered.

*So ordered.*

REARDON, J. (with whom Quirico, J., joins, concurring in the result but dissenting in part). I agree with the conclusion that on the basis of the instructions given to the jury by the trial judge the evidence on the question whether the defendant was guilty of "wanton" or "reckless" conduct resulting in a death was insufficient to permit the case to go to the jury. However, I disagree with the conclusion that the evidence on the question whether there was a live birth was not sufficient to permit the case to go to the jury. I also disagree with the conclusion that the defendant was entitled to a directed verdict of acquittal by reason of any prejudicial shift from the accusation as specified by the Commonwealth to the alleged crime as defined in the judge's instructions to the jury.

1. Since it is of high importance that the terms in which the judge charged the jury be fully understood, there is set out below that portion of the charge relevant to the question whether the jury might consider the defendant's prenatal conduct. The judge said, "Let me first discuss the word 'person.' I do this at the very beginning because if there had been no 'person' as such in this case there could not be any conviction of the crime of manslaughter. That is so because one of the essential elements of the

can Humanist Association, American Jewish Congress, Board of Church and Society of the United Methodist Church, National Women's Conference of the American Ethical Union, Union of American Hebrew Congregations, Unitarian Universalist Association, and United Church Board for Homeland Ministries; Center for Constitutional Rights and the National Jury Project; Certain Medical School Deans, Professors, and Individual Physicians; Civil Liberties Union of Massachusetts; League of Women Voters of Massachusetts and League of Women Voters of Boston; NAACP Legal Defense and Educational Fund, Inc.; National Medical Association, Inc.; Planned Parenthood Federation of America, Inc., Association of Planned Parenthood Physicians, Inc., and Planned Parenthood League of Massachusetts.

crime of manslaughter, of course, is the death of a person. So we come at the very beginning to define that word 'person.' The Constitution of the United States does not define 'person' in so many words. There are several references in this regard in the Constitution for the listing of the determinations of citizens or qualifications for elections, matters of extradition proceedings, and so forth. They are found in the First and Twelfth and the Twenty-Second Amendments as well as Sections 2 and 3 of the Fourteenth Amendment, among other places. In nearly all these instances, the use of the word is such that it has applicability only postnatally. That means after birth. None of the definitions indicates with any assurance that it has any possible prenatal application. . . . A fetus is not a person, and not the subject of an indictment for manslaughter. In order for a person to exist, he or she must be born. Unborn persons, as I said, are not the subject of the crime of manslaughter. Birth is the process which causes the emergence of a new individual from the body of its mother. Once outside the body of its mother, the child has been born within the commonly accepted meaning of that word. Killing or causing the death of a person who is born alive and is outside the body of his or her mother may be the subject of manslaughter. In order for the defendant to be found guilty in this case, you must be satisfied beyond a reasonable doubt, as I have defined that term for you, that the defendant caused the death of a person who had been alive outside the body of his or her mother. If you believe beyond a reasonable doubt that the defendant, by his conduct, caused the death of a person, once that person became such as I have defined the word for you, you may find the defendant guilty of the crime of manslaughter, if that death was caused by wanton or reckless conduct on the part of the defendant. If, on the other hand, you do not find beyond a reasonable doubt that the defendant by his conduct caused the death of a person, then you must acquit him of the crime charged. And if you find that even though death occurred, it was not due beyond a reasonable doubt to any wanton or reck-

less conduct on the part of the defendant, then likewise you must acquit."

The foregoing portions of the charge have been set out at some length to demonstrate that given these instructions no jury under any plain understanding of the English language could conclude that the conviction of the defendant could occur unless there had been a live birth of a child outside the body of the mother and that *subsequently* there were wanton or reckless acts of the defendant, which acts caused the death of that child.

The judge's instructions, not excepted to by the defendant, became the law of the case which governed the subsequent actions of the jury. *Commonwealth* v. *Graves,* 363 Mass. 863, 868 (1973). *Commonwealth* v. *Peach,* 239 Mass. 575, 581 (1921). The jury were thus left to consider and decide whether in the event of a live birth, the defendant was thereafter guilty of any "wanton" or "reckless" conduct resulting in a death. I am in agreement with the principal opinion that the evidence of the defendant's postnatal actions was not sufficient to permit such a finding. This is not to say that the evidence of the defendant's postnatal conduct was insufficient to permit a finding that he may have been negligent, but that was not the issue submitted to the jury. There was evidence before the jury that the gestational age of the fetus was twenty-four weeks or more, and a jury might properly have found that the extremely brief examination of the child when delivered was not consonant with the care which should have been accorded to it. A cursory examination of the anterior chest wall for a period of three to five seconds only, appears to have been the sole effort by the defendant to determine if life had been produced.

2. I am further of the belief that had the jury not been bound by the limiting instructions it would have been open to them to consider the defendant's prenatal conduct in determining whether his over-all conduct was wanton or reckless. The jury had evidence before them which assessed the age of the fetus at twenty-four weeks and beyond. Nothing was presented to the jury to indicate that

the defendant at any time felt the slightest concern
whether his operation would produce a live birth. He made
no effort to determine the condition of the fetus prior to
birth. The jury also had before them the testimony of a
medical witness that the defendant, after making the
uterine incision, engaged, as the principal opinion states,
in a "sweeping motion," evidently the one detaching the
placenta, after which he "remained motionless for three to
five minutes with his hand in the uterus, his eyes fixed on
a clock on the wall." There was expert testimony that
removing the placenta in the fashion which occurred in
this case was similar to "cutting the air hose on a salvage
diver," and there was medical testimony that death might
well follow. It is uncontroverted that the treatment ac-
corded to this fetus was not that to be expected when a
live birth was desired. In fact, all prenatal conduct of the
defendant was based on the proposition that a live birth
was not desired. In *Planned Parenthood of Cent. Mo.* v.
*Danforth,* 428 U.S. 52 (1976), the court struck down a
Missouri statute designed to regulate abortions in that
State. The statute, House Bill No. 1211, stated in part in
§ 6(1), "No person who performs or induces an abortion
shall fail to exercise that degree of professional skill, care
and diligence to preserve the life and health of the fetus
which such person would be required to exercise in order
to preserve the life and health of any fetus intended to be
born and not aborted." *Id.* at 82. The objection of the
majority of the Justices of the United States Supreme
Court, speaking through Mr. Justice Blackmun, to that
section was: "It does not specify that such care need be
taken only *after* the stage of viability has been reached"
(emphasis supplied). *Id.* at 83. Mr. Justice White, con-
curring in part and dissenting in part, in speaking of
§ 6(1), stated: "Since the State has a compelling interest,
sufficient to outweigh the mother's desire to kill the fetus,
when the 'fetus'... has the capability of meaningful life
outside the mother's womb,' *Roe* v. *Wade,*... [410 U.S.
113, 163 (1973)], the statute is constitutional." *Id.* at 100.
There was ample evidence before this jury that the fetus

was viable. I see nothing in the *Planned Parenthood* case which inhibits the State from testing the defendant's prenatal conduct in these circumstances in a determination whether his actions were wanton or reckless, and in my belief the jury might well have been so charged.

3. I find myself also in disagreement with the conclusion that the evidence was not sufficient to permit the jury to find that there was a live birth in this case. There was evidence which would permit either affirmative or negative conclusions on the question, and there was therefore a jury question. Much of the testimony came from specialists of distinction in the field of obstetrics and gynecology but it is undoubted that there was before the jury evidence of an autopsy of what was in all respects a normal child with a body weight which was small, to be sure, but with which other children have survived. There was evidence of respiratory activity and of a fetal age which would indicate viability. There was evidence that given medical support the baby would survive, and that the subject had a gestational age of up to twenty-six weeks, in the third trimester, which placed it in the age bracket appropriate for protection. It is not for us on the basis of the record to determine whether life might have continued. Rather we are charged with determining whether the jury could have so found, and it seems to me that there is ample evidence in the transcript from which a jury could properly have concluded that a child had achieved life.

4. It cannot be gainsaid that there was a disjunction between the pre-trial particulars filed by the Commonwealth and the crime as ultimately defined by the judge in his instructions to the jury. The particulars asserted that the victim of the alleged manslaughter died while inside the mother or when partially removed from the mother. The judge instructed the jury that in order to find the defendant guilty they must find "beyond a reasonable doubt ... that the defendant caused the death of a person who had been alive outside the body of his or her mother." The particulars asserted that the homicidal act was the defendant's wait for three to five minutes with his hand

inside the patient's uterus after he had separated the placenta. The judge instructed the jury that postnatal, rather than intrauterine, conduct was necessary to support a conviction.

Justice Kaplan concludes in his opinion that in the circumstances of this case there was a prejudicial variance from the accusation as specified by the Commonwealth to the crime as defined in the judge's instructions, and that as a result thereof the defendant was entitled to an acquittal. I am unable to agree with that conclusion.

In my view the crucial question on this issue is not whether there was a variance between the allegations and the proof but rather whether the defendant was prejudiced by any such variance. General Laws c. 277, § 35, provides that "[a] defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, *unless he is thereby prejudiced in his defense*" (emphasis supplied). I would hold that in the circumstances of this case the defendant was not prejudiced in his defense by reason of the variance, and that therefore he was not entitled to a directed verdict of acquittal. See *Commonwealth* v. *DeVincent,* 358 Mass. 592, 596-597 (1971).

On October 15, 1974, the Commonwealth apprised the defendant in writing that "[t]he Commonwealth maintains that the victim in this case was a child detached from his mother ... [T]he legality of the termination of pregnancy is not an issue in this case. What is at issue is the defendant's additional act, unnecessary to and no part of the abortion, of killing the child, detached from his mother."[1] On January 10, 1975, when the Commonwealth made its opening statement to the jury, the defendant was again apprised that the Commonwealth would present evidence of the live birth of the child who was the victim

[1] This statement appears in an affidavit filed by the Commonwealth in opposition to the defendant's motion for an order for dismissal of the indictment under the authority of *Commonwealth* v. *Brandano,* 359 Mass. 332 (1971).

of the alleged homicide. This was done in language which is reproduced in the margin of this opinion.[2]

By reason of the nature, timing and frequency of these several statements made by the prosecutor, some contained in an affidavit and others made on the record of the proceedings in open court, the defendant knew or should have known that the Commonwealth was not proceeding against him criminally on any theory that his action in performing an effective abortion per se constituted the crime of manslaughter. Rather he knew, or should have known, from those statements that his prosecution was based on the alleged premise that, although he had undertaken and intended to perform an effective abortion, his efforts had instead resulted in an unintended, and perhaps unexpected, birth of a child, and that he had caused the death of the child by his subsequent wanton or reckless conduct. Therefore, on the basis of all of the circumstances of this case, I am unable to agree either with the conclusion that the defendant was prejudiced by the claimed variance or with the conclusion that he is or was entitled to a directed verdict of acquittal.

Viewing this matter from the vantage point of detached retrospection, it may be appropriate to suggest that it would have been preferable for the Commonwealth to have moved in writing to amend its particulars to conform to the proof, and for the judge to have allowed such a motion if it were filed. Such an amendment is permissible under G. L. c. 277, § 40, "at any . . . stage of the proceedings" after arraignment. Such amendments are permitted during trial, after the evidence has closed, *Commonwealth* v. *Cor-*

---

[2] Just prior to the Commonwealth's opening, counsel for the defendant said to the judge: "I would suggest . . . that there is no evidence, and that there will be no evidence that this fetus ever breathed . . . and that therefore it never became a human being." To this the prosecutor replied: "I don't want to take my brother by surprise, there will be evidence of breathing." During his opening statement the prosecutor told the jury: "There will be evidence that at the time that this particular male child [the victim] was detached from the mother and no longer dependent on the mother that the male child would have lived outside of the mother."

*coran,* 348 Mass. 437, 441-442 (1965), or after final argument, *Commonwealth* v. *Lussier,* 333 Mass. 83, 91-92 (1955). However, it does not follow that a defendant who has not otherwise been prejudiced by a variance is entitled to an acquittal by reason of the absence of such an amendment. I believe that the entry of an acquittal on the ground of variance would be contrary to the spirit and intent of St. 1899, c. 409, entitled "An Act to provide for the simplification of criminal pleadings," from which our present statutes on particulars and amendments thereof, G. L. c. 277, §§ 35 and 40, originate.

I join with Justice Kaplan in his comment on the conduct of the trial by the judge. A reading of the transcript of evidence which is in the thousands of pages gives sufficient indication of the patient, learned and fair treatment of the parties which he brought to a trial presenting entirely new problems.

HENNESSEY, C.J. (dissenting in part). I dissent from the main opinion's[1] conclusion that the defendant was entitled at his trial to a directed verdict of not guilty. The Commonwealth had the burden of proving beyond a reasonable doubt that there was a live birth and that death was caused by the wanton or reckless conduct of the defendant. In my view there was sufficient evidence as to each of these elements to warrant submission of the case for the jury's consideration. Further, I conclude that the defendant was on sufficient and timely notice of the offense charged and cannot now show prejudice by reason of variance between charge and proof. From these determinations it follows that I dissent from the majority's conclusion that a judgment of not guilty must now be entered.

---

[1] Justices Braucher and Wilkins join with Justice Kaplan in the main opinion in its entirety. However, Justices Reardon and Quirico join the main opinion only as to the result reached (a judgment of not guilty) and some of its reasoning related to wanton or reckless conduct. For that reason I have referred to the main opinion hereinafter as the "Justice Kaplan opinion."

Commonwealth *v.* Edelin.

I depart from the Justice Kaplan opinion's approach both as to the statement of the applicable law, and the appraisal of the facts of the case. As to the law, the Justice Kaplan opinion applies *Wade-Bolton* in impermissible ways to this manslaughter case, and also offers unacceptable legal premises as to the common law of this Commonwealth. As to the facts of this case, in reaching the conclusion that a directed verdict of not guilty was required, the Justice Kaplan opinion indulges in a weighing and discarding of evidence in a manner permitted only to the jury. On the directed verdict question it is not relevant that much of the crucial evidence offered by the Commonwealth was controverted by the defendant and his witnesses.[2]

Nevertheless, I would not order that the judgment of guilt be affirmed, because in my view the judge's instructions to the jury were inadequate, and substantially less than the minimum to which the defendant was entitled.[3] Therefore, if my views were to prevail, the verdict of the jury would be set aside and a new trial would be ordered. I summarize later in this opinion the additional jury instructions which I believe should have been given.

## *Variance*

There was no prejudicial variance between charge and proof. The indictment specified the offense of manslaughter, the date of the alleged offense, and the name of the alleged victim. Thus, there could be no possibility of double jeopardy, since there is no further, other, similar

[2] The weight and believability of the evidence, as distinguished from existence of the evidence, has possible relevance at the appellate level only as to the issue whether the defendant might be entitled to a new trial because the jury's verdict was against the weight of the evidence.

[3] I join in the majority's statement which commended the trial judge's direction of this complex and unique case. In instructing the jury, as in all other phases, the judge was in large part dealing with unprecedented problems.

crime with which the defendant could be charged. Cases cited by the defendant are inapposite, because they do not thus preclude the possibility of double jeopardy. E.g. *Commonwealth* v. *Albert,* 307 Mass. 239 (1940); *Commonwealth* v. *American News Co.,* 333 Mass. 74 (1955). Further, under the law of the Commonwealth, a defendant shall not be acquitted on the ground of variance between the allegations and the proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defense. G. L. c. 277, § 35. There could be no prejudice here. See *Berger* v. *United States,* 295 U.S. 78, 82 (1935).

The defendant was aware of the elements of the offense charged, and his attempts to obtain particulars were aimed clearly, not at gaining more specificity of the allegations, but at obtaining admissions from the Commonwealth in support of the defendant's pre-trial motions for dismissal of the indictment. It is surprising to see the acceptance, in the Justice Kaplan opinion, of the defendant's position on the issue of variance. Whatever ambiguity existed in the particulars as to "live birth" was resolved by assertions by the prosecutor, on the record, several months before the trial, that the subject breathed, and by the Commonwealth's pre-trial affidavit that the subject was breathing and had circulation. The defendant made an unsuccessful attempt to obtain dismissal under the procedures set out in *Commonwealth* v. *Brandano,* 359 Mass. 332 (1971), which permit the defendant to pursue the equivalent of a summary judgment of dismissal before trial. The effort of counsel was commendable, but it should not result later in a dismissal on variance grounds simply because the defendant did not achieve the results he had hoped for from his attempt to bind the Commonwealth to a pre-trial statement of its evidence and its theories of proof. Long before trial commenced, there was an unequivocal statement of the offense charged. Whatever language could be said to have misled the defendant as to the issue of live birth was clarified on the record on several occasions before the trial.

## Live Birth

There was ample evidence to warrant an inference that the subject[4] was viable and was born alive. Many eminent medical specialists testified at the trial, expressing diverse opinions as to these issues. It is true that there was substantial expression of expert opinion to support the defendant's position. Nevertheless, the inquiry here on the issue of directed verdict points, as it must, to the evidence as viewed in the light most favorable to the Commonwealth. I state below a brief summary of some of the Commonwealth's substantial evidence which required submission of these issues to the jury.

Dr. George W. Curtis, the medical examiner, testified that the body at autopsy was normal in all respects, weighed 700 grams at autopsy, and would have weighed more on October 3, 1973. He opined that there was respiratory activity, at least a gasping of breath, outside the mother.

Dr. Denis Cavanagh, a diplomate in the Royal College of Obstetricians and Gynecologists of England, a diplomate of the American Board of Obstetrics and Gynecology, chairman of the department of obstetrics and gynecology in St. Louis, Missouri, and an author of many scientific publications, placed the age of the fetus at approximately twenty-four weeks. Based on other medical evidence that the fetus was twenty-four weeks of age and weighed 700 grams, he was of opinion that had the fetus been immediately removed after the detachment of the placenta "the new born infant would have been alive."

Dr. Norman L. Virnig, director of the newborn service at the St. Paul Ramsey Hospital, and a professor of pediatrics in Minnesota, stated his opinion that the baby's gestational age was twenty-four weeks, that in this case he thought the "baby was viable," and further stated that

---

[4] The parties in their briefs use the terms "baby," "fetus" and "subject." To avoid legal implications in the terminology, I have used the term "subject" (a term used frequently by some of the medical witnesses) at many places in this opinion.

had it been removed, on the detachment of the placenta, and "given medical support, the baby would survive."

Dr. Joseph Kennedy, Jr., a professor of pediatrics at Tufts specializing in neonatology, put the subject's gestational age at about twenty-four weeks, and said "that the subject was viable in that he had a chance for life."

Dr. John F. Ward, a fellow in the American College of Pathologists, a clinical professor at the University of Pittsburgh, School of Medicine, stated his opinion that the "fetus was approximately six and a half months gestation," and from a pathological examination of the lungs, stated his belief that the subject did breathe outside the uterus. He further stated that the subject "was not a stillborn."

Thus there was substantial evidence of a live birth. It meets even the defendant's assertion that there must be proof that there was a chance for "meaningful life" or survival for a "minimum period," within the meaning of *Wade-Bolton.* I am not sure what those terms mean. I do state that it is not for any doctor to guide his conduct by his own estimate as to the duration or quality of life likely to occur.

## *Wanton or Reckless Conduct*

As to the required proof of wanton or reckless conduct of the defendant which caused the death,[5] I would agree that there was not sufficient evidence for the jury's consideration *if* I could accept the majority's premise that the judge in his instructions permitted the jury to consider only the postnatal conduct of the defendant. I believe such an instruction would be in error, but it would have been the law of the case if given, and would have effectively restricted the consideration of the evidence to the postnatal period. However, as I read the instructions, and the circumstances in which they were given, the judge permitted

---

[5] Central to the Commonwealth's case is the concept that abortion (terminating the pregnancy before full term) does not necessarily involve death of the fetus, and indeed the viable fetus must have protection.

consideration of both prenatal and postnatal conduct. Further, contrary to the view expressed in the Justice Kaplan opinion, I believe this was a valid instruction within the meaning of *Wade-Bolton* and within the common law of the Commonwealth.

Clearly the judge's instructions[6] meant that the death, not necessarily the defendant's conduct, must have occurred after the birth of the subject. The choice of words, although perhaps redundant, was consistent with a desire upon the judge's part to make it plain to the jury that a "person" must be born alive. Much of the evidence at the trial concerned the procedures followed by the defendant while the subject was in utero. Just before the judge's charge, the prosecutor devoted a major part of his closing argument to the jury to a discussion of that same prenatal evidence as proof of the indictment. No instruction by the judge during the trial or in his final charge to the jury limited the jury's consideration to postnatal conduct. The jury necessarily understood the charge to be addressed to all relevant conduct of the defendant, and the judge clearly intended that the jury should have that understanding.

Given a live birth, the common law of Massachusetts permits consideration of the defendant's prenatal conduct in support of a manslaughter indictment. There is no Massachusetts case directly in point.[7] The Justice Kaplan opinion relies on the case of *Dietrich* v. *Northampton,* 138 Mass. 14, 15, 17 (1884), which I suggest does not reach

[6] In relevant part, the instructions (see also the quotation from the charge in the Justice Kaplan opinion) were as follows: "[Y]ou must be satisfied beyond a reasonable doubt... that the defendant caused the death of a person who had been alive outside the body of his or her mother. If you believe beyond a reasonable doubt that the defendant, by his conduct, caused the death of a person, once that person became such as I have defined the word to you, you may find the defendant guilty of the crime of manslaughter, if that death was caused by wanton or reckless conduct on the part of the defendant. If, on the other hand, you do not find beyond a reasonable doubt that the defendant by his conduct caused the death of a person, then you must acquit him of the crime charged...."

[7] This is not surprising in view of the applicability, prior to *Wade-Bolton,* of the Commonwealth's anti-abortion statutes.

or control the issue. There is support in the English common law and in the law of at least four American jurisdictions that conduct toward a subject prenatally may give rise to criminal liability if it results in the death of the child after its live birth. E. Coke, Third Institute 50 (1644). *State* v. *Cooper,* 22 N.J.L. 52 (Sup. Ct. 1849) (dictum). *Abrams* v. *Foshee,* 3 Iowa 274, 278 (1856). *Clark* v. *State,* 117 Ala. 1 (1898). *Morgan* v. *State,* 148 Tenn. 417 (1923). See also *Huskey* v. *Smith,* 289 Ala. 52, 55 (1972); *State* v. *Anderson* 135 N.J. Super. 423, 427-428 (Law Div. 1975). Thus the law is not applied prospectively in this case. In the light of the centuries-old precedents, the defendant's conviction does not violate the due process clause of the United States Constitution. *Bouie* v. *Columbia,* 378 U.S. 347, 356 (1964). The defendant certainly knew of the "possible criminality" of his conduct. *Mullaney* v. *Wilbur,* 421 U.S. 684, 690 n.10 (1975). Even if this were a case of first impression, application to the defendant of the common law standards of manslaughter would not be an unconstitutional declaration of criminality. "It is not necessary that [courts interpreting the common law] be able to point to a decided case exactly similar in its facts." Clark & Marshall, Crimes § 1.03 at 21 (7th ed. 1967). Cf. *Commonwealth* v. *Henson,* 357 Mass. 686 (1970).

The duty to protect the life of a viable fetus has always been crystal clear and, as shown *infra,* this duty has not been modified in the slightest by *Wade-Bolton.* Given birth followed by death, it would be extraordinary if the common law did not permit consideration of all relevant conduct of a defendant in a manslaughter case. It would not be reasonable for a doctor to assume otherwise. Clearly the doctor's duty to the viable fetus arises at the time he knows or reasonably should know that he could be dealing with such a subject. In any case where he is fairly chargeable with such knowledge during the prenatal stage, it would be incongruous to exclude proof of his conduct during that period.

The Justice Kaplan opinion states that "common sense" tends to support the exclusion of prenatal conduct from

consideration for, as they say, if a contrary rule were adopted a putative defendant might be encouraged to make sure he extinguished the fetus while still in utero. This projection is incorrect, in my view. On the contrary, the common law rule as I have phrased it would support the community's and the medical profession's overwhelming interest in sustaining the life of the viable fetus. All of this must be received for the future against the background of the Commonwealth's present anti-abortion statute, presumably tailored to the requirements of *Wade-Bolton,* and potentially available in any case which fits the Justice Kaplan opinion's proposition that a physician might choose to extinguish the life of the viable fetus before birth.

I reject the Justice Kaplan opinion's contention that constitutional principles, as expressed in *Wade-Bolton,* preclude consideration of prenatal conduct.[8] By the holdings of the United States Supreme Court, the States may proscribe abortions on demand in the stage subsequent to viability.[9] The constitutional immunity of the doctor from criminal prosecution extends only through the stages prior to viability. That immunity extends to the privilege of terminating the pregnancy; it does not protect against wilful, wanton or reckless conduct which causes the death of a viable fetus. Just as the States may now provide criminal anti-abortion statutes which apply to the stage subsequent to viability, so may the laws of homicide apply in cases of a viable fetus, a live birth and a subsequent death caused by prenatal and postnatal criminal conduct.[10]

---

[8] The Supreme Court has not addressed this issue, although it has addressed the question of criminal prosecutions in the general context. See *Planned Parenthood of Cent. Mo.* v. *Danforth,* 428 U.S. 52, 83-84 (1976), where it is stated: "[A] physician's or other person's criminal failure to protect a live-born infant surely will be subject to prosecution . . . under the state's criminal statutes."

[9] Even after viability, the State's power to forbid abortion is limited in cases where the life or health of the mother is endangered. No contention of such danger to the mother was made in the instant case.

[10] Some have expressed the view that, while the Supreme Court perhaps has the power to limit as it did (in *Wade* and *Bolton*) the control by the States over abortions, the judgment of the court in exercising

Reviewing both prenatal and postnatal conduct, there clearly was sufficient evidence for the jury to consider on the issue of recklessness. Considering the evidence most favorable to the Commonwealth, conclusions were warranted that the child was born alive but suffering from the effects of drugs and lack of oxygen, which in turn were the result of the defendant's techniques, chosen without regard to the possibility of a live birth. Further, an inference was permissible that the child died as a result of its weakened condition together with the defendant's failure to stimulate it or aid it after birth. Thus, if the jury believed the evidence most favorable to the Commonwealth, they were warranted in concluding that the defendant acted with indifference to or disregard of probable consequences to another. *Commonwealth* v. *Welansky,* 316 Mass. 383, 399 (1944). This conclusion would be sufficient to support an inference of recklessness.

There was evidence that the defendant knew that a physician and a medical student in pre-abortion examinations had placed the age of the fetus at twenty-four weeks. Another doctor placed it at twenty-one to twenty-two weeks and the defendant also knew this. This was to be considered in light of the fact that viability may occur, as recognized in *Wade-Bolton,* in twenty-four weeks. The defendant in his testimony stated that he had reached a conclusion that the age of the fetus was twenty to twenty-two weeks but, again, the credibility of his testimony was

that power was an improvident and extravagant exercise. (See, e.g., Mr. Justice White dissenting in the case of *Doe* v. *Bolton,* 410 U.S. at 222 [1973]; Hennessey, J., dissenting in *Doe* v. *Doe,* 365 Mass. 556, 564 [1974]). The assertion can be stronger as to the instant case, which it could be found, is concerned with a viable subject. Except for the case in which the life or health of the mother is endangered, the Constitution does not permit limitation, as based upon the mother's right of privacy, of the State's power of control over abortion of a viable subject. The State has a compelling interest to sustain the life of the viable fetus which outweighs any desire of the mother to abort the fetus. The defendant's argument that criminal proceedings must not be allowed to chill the exercise of the rights recognized in *Wade* and *Bolton* is treated respectfully in the discussion of "Jury Instructions" later in this opinion.

for the jury. Thus, there was evidence from which it could be found that the defendant was aware, in advance of the abortion, that he could be dealing with a viable fetus.

There was evidence that the defendant separated the placenta from the uterine wall but then delayed the delivery during a period of at least three minutes while the defendant remained motionless with his hand in the uterus. There was evidence that such a procedure is nowhere sanctioned as accepted medical practice. This was compared by one medical witness, Dr. Mecklenburg, to "cutting the air hose on a salvage diver." Other medical testimony supported findings that this deprivation of oxygen was deleterious, and would result in death of the child after birth and not while it was in utero.

The jury could also find from the evidence that the hysterotomy method is consistent with production of a live child, but that the techniques used by the defendant made a relatively easy operation difficult. They could find that, prior to the sixteenth week of pregnancy, hysterotomy procedure involves separation of the placenta after initial incision into the uterus and before the fetus is removed from the mother's body. At or prior to the sixteenth week the fetus is very small, weighing about 100 grams and it is possible, after separating the placenta, to remove the fetus and sac intact. A twenty-four week fetus, however, would weigh about 600 grams and intact removal would be impossible. The defendant knew that the gestational age of the fetus was far beyond sixteen weeks and that it was far heavier than 100 grams. The defendant knew before the operation, of medical opinions relating to twenty-four weeks, and he himself thought it was twenty to twenty-two weeks. There was evidence of a weight of 700 grams, and he could be held to a (pre-operative) fair idea of the size from his prior examinations of the mother. It could be found that he unnecessarily used a technique which endangered the fetus's chance of survival. There was further evidence from which it could be inferred that anesthesia techniques were unnecessarily used which could be deleterious to the health of a viable fetus.

From all of this the jury could conclude that the defendant, knowing he was engaged in a late-term abortion and that a live birth was possible, acted with disregard for the consequences to the subject. Additionally it could be found that he proceeded with methods which unnecessarily endangered the subject. The defendant's total failure to have regard for the subject's well being was consistent with his testimony that he regarded the death of the fetus as "presupposed."

It is clear that the defendant's state of mind is a crucial consideration as judged at all relevant times before, during and after the abortion. It is in that regard that the judge's instructions to the jury were particularly wanting. I turn now to that phase.

### *Instructions to the Jury*

The courts must, in dealing with abortion cases, avoid the "overhanging risk [for physicians] of incurring criminal liability at the hands of a second-guessing lay jury." (Statement of Mr. Justice Stewart in *United States* v. *Vuitch*, 402 U.S. 62, 97 [1971].) The Justice Kaplan opinion here attempts to avoid that overhanging risk by concluding that the case should not have been submitted to the jury, and reaches this result despite substantial factual evidence and expert medical opinions that, if accepted by the jury, established all elements of the Commonwealth's case.

The medical judgment of the physician must have protection against unjustified second-guessing, but in this case the protection should have been accomplished, not by precluding the jury's consideration, but by appropriate jury instructions.

The sense of the Justice Kaplan opinion, as I read it, is that the proclaimed medical judgment of the defendant overrides the opposing evidence and extinguishes the issues of fact. From this it might be inferred that actual malice must be shown. The Justice Kaplan opinion, not so much in its statement of the rules, as in its treatment of the evidence, may be said to import a subjective standard.

This in turn would presumably require proof of the defendant's *actual* pre-abortion knowledge of viability. Such proof equates with murder, not with manslaughter. In a manslaughter case, the standard of reckless conduct is at once subjective and objective. *Commonwealth* v. *Pierce,* 138 Mass. 165, 175-180 (1884). *Commonwealth* v. *Welansky,* 316 Mass. 383, 398 (1944).

In this case the defendant was entitled to an instruction that he could not be convicted if his conduct was based upon medical judgments which were made in good faith and were reasonable. Good faith and honest belief that the fetus was not viable (see *Kudish* v. *Board of Registration in Medicine,* 356 Mass. 98, 99, 100 [1969]), would not serve to protect him if the facts known to him or those of which he remained in "conscious ignorance" should have alerted him to the wrongfulness of his conduct. *Commonwealth* v. *Pierce,* 138 Mass. 165, 179 (1884). In this case, based upon the entire evidence, it was for the jury to say whether the defendant's medical judgments were within the bounds of reasonableness, but the defendant was entitled to have the issue decided under adequate jury instructions.

More specifically, since in my view prenatal conduct must be considered, the jury should have been instructed that to establish guilt they must find beyond a reasonable doubt that the fetus was in fact viable; that there was a live birth and subsequent death; that the death was caused by the defendant's prenatal or postnatal actions or omissions to act, in reckless disregard of the well-being of the subject; and that the defendant formed his judgment of non-viability either in bad faith, or unreasonably, based upon facts he knew or reasonably should have known. Such instructions were not given.

### Conclusion

This opinion is not, of course, an implied statement of the guilt of the defendant. No one can say what the jury's conclusion would have been, if they had been sufficiently instructed. The emphasis in this opinion is, as it must be, on the applicable principles of law.

Manslaughter prosecutions related to abortions are not likely to occur in the future. It can be predicted that if any prosecutions arise, they are more likely to arise under the new anti-abortion statutes. Nevertheless, there will be applicability, in any prosecution for illegal abortion, of the principle that the medical judgment of the physician may not be proof against criminal conviction where it is shown that his judgment was in bad faith or unreasonable. The issues of the duration of the pregnancy ("twenty-four weeks or more") and the threat to the life or health of the mother, are raised in the anti-abortion statutes (see G. L. c. 112, § 12J, inserted by St. 1974, c. 706, § 1), and these issues will require application of medical judgment.

Because of this possibility of recurrent application of these principles, I trust that no language in any of the three opinions in this case will be construed so as to overstate the constitutional protections against criminal prosecution afforded doctors charged with crimes arising out of abortions. On appropriate evidence, the question of guilt is for the jury's decision. I trust also that evidence as to the medical judgment of the defendant physician in any such case has here been placed in proper perspective, as subject to the protection of the tests of good faith and reasonableness, and as requiring most serious consideration by the court and jury.